**In re SELGAR REALTY CORPORATION, Debtor.**

**Frank and Rosemarie LOPA, Plaintiffs,**

**v.**

**SELGAR REALTY CORPORATION, Defendant.**

**Bankruptcy No. 183–30314–260.
Adv. No. 186–0192.**

United States Bankruptcy Court, E.D. New York.

March 30, 1988.

Hart & Gussow by George M. Hart, and John Gussow, Staten Island, N.Y., for debtor.

Jeffrey Francis Borrell, Staten Island, N.Y., for plaintiffs.

## DECISION AND ORDER

CONRAD B. DUBERSTEIN, Chief Judge.

Before the court is an adversary proceeding seeking specific performance of an alleged contract for the sale of certain real property owned by the defendant-debtor. For the reasons stated below this court holds: (1) the writing does not satisfy the necessary requisites for an enforceable contract under New York State Law; and (2) the alleged sale falls outside the ordinary course of business and is void without prior approval of the bankruptcy court.

## FACTS

Selgar Realty Corporation ("Selgar"), the debtor herein, filed a petition for relief under Chapter 11 of the Bankruptcy Code

which is pending before this court. It is engaged primarily in the business of renting real property which it owns.

The properties owned by Selgar at the commencement of the case were 580, 635, 639 and 641–643, Bay Street, as well as 113 Water Street, all in Staten Island, New York. Two of the lots, 580 and 635 Bay Street, were subsequently sold with the approval of the court and after notice and hearing as required by § 363 of the Bankruptcy Code. The post-petition events leading up to the instant proceeding are in dispute and the court finds the following.

Frank Lopa ("Lopa") met with Victor Grasso ("Grasso"), president and sole shareholder of Selgar, in Frank and Rosemarie Lopa's ("the Lopas") delicatessen to discuss the possible purchase of some of Grasso's real property. Grasso was conducting business under the name of Aggressive Enterprises and gave Lopa a business card to that effect.

After negotiations at the deli, Lopa contends that it was agreed that Grasso would sell 639, 641–643, and 647–649 Bay Street to the Lopas for $175,000. It is to be noted that 647–649 Bay Street is not included in the properties owned by the debtor. To commemorate their discussions, Lopa gave Grasso a check for $100 which admittedly was neither deposited nor cashed. Lopa testified that at the meeting he opened to a clean page in his appointment book which was divided into four sections (see exhibit). The top third of the page is designated "November 22." Below that, separated by a heavy black line, is a block for "November 23" and the bottom third is divided into contiguous blocks for "November 24" and "25."

In the top block, written in pencil by Lopa, is the following:

On Oct. 22, 1984

4:30 P.M.

I, Frank Lopa & Rosemarie Lopa, reach, agreement with Vic Graso to give him a $100 dep. & binder for the following bldgs. 639 Bay 641–643 Bay & Lot 647–649 Bay St. Price $175,000. Terms 1,000 on contract—this week, $50,000 cash & $125,000 mortgage subject to bank approval. Closing to take place in 60 to 90 days.

/s/ Frank Lopa

/s/ Rose Marie Lopa

The middle block was more informal. At the top of the space are the words "$100 Dep." with the initials "FL," presumably for Frank Lopa. Below that, entirely enclosed in parentheses and admittedly inscribed by Grasso, are the words:

639 Bay 641–643 Bay

Also vacant lot known as

647–649 Bay St. $175,000

/s/ Vic Grasso

Also in the middle block is the signature of Marcello Milone ("Milone"), allegedly a witness to the transaction, along with the date and time. The bottom third of the page is empty except for the name, "G. Hart" (George Hart), attorney for the debtor, and the names and telephone numbers of Grasso and one Crismali, the attorney for the Lopas.

The Lopas and Milone all testified that the Lopas signed in the top box and Grasso subsequently signed in the middle box after adding the contents recited above. Grasso, however, attests that when he signed his name, the block above which now reads "I, Frank Lopa ..." was devoid of any writing.

That evening Lopa and Milone met at Grasso's home. Lopa characterized this meeting as a celebration for entering into a contract while Grasso said it was in hope that a deal could be worked out between their respective attorneys. At this time a meeting was purportedly scheduled the following Wednesday for the parties and their attorneys to execute a formal contract. The attorneys' meeting was subsequently cancelled and rescheduled for that Friday. In the meantime, Lopa secured from his bank the necessary mortgage applications which were neither completed nor returned to the bank.

Three days after the meeting in the deli, Grasso, unbeknownst to Lopa, entered into formal contracts for the sale of 639 and 641–643 Bay Street with Doris Weintraub ("Weintraub"), a secured creditor of Selgar

who had obtained a first mortgage on these parcels during the early stages of this case with the court's approval after notice and a hearing. Weintraub then contacted Lopa, a day before his Friday meeting with Grasso, to inform him of her rights to the properties.

Lopa testified that it was approximately one year after these events that he first discovered that Selgar, the owner of two of the properties, was in bankruptcy. Furthermore, Lopa testified that Grasso made no mention of the bankruptcy or a need to obtain approval of the bankruptcy court before any sale. Nor were the same made known to him when Lopa's attorney filed a lis pendens on the subject premises and commenced a state court action for specific performance. In fact, the debtor's attorney answered the state court complaint and did not raise the pending Chapter 11 case as a defense. The plaintiffs, after hearing of the debtor's bankruptcy and financial condition, had a title search done on the lots which also failed to disclose the existence of the bankruptcy case.

George Hart, the attorney for the debtor, testified that he informed the Lopas' attorney, Vince Crismali, of the bankruptcy and the need for a court order. Grasso denies the Lopas were not informed that approval of the court would be necessary before closing on the property.

All of the foregoing came to light when Selgar applied to the court for leave to sell the subject parcels by sale on notice to all creditors and parties in interest. Both Lopa and Weintraub appeared in opposition to the proposed sale. Lopa also moved for specific performance of the alleged contract.

## DISCUSSION

The central issues in this proceeding are whether a valid contract of sale exists between the Lopas and Selgar and if so, whether the contract can be enforced in light of the debtor's bankruptcy case pending before this court and the lack of a court order approving such a sale. Before these questions can be reached, a threshold issue of competence must be examined; specifically, whether Grasso had authority to sell the subject premises.

There can be little argument that as president and sole owner of the debtor corporation, Grasso is empowered to enter into contracts as its agent. The problem arises, however, in the fact that the document, the exhibit attached which Lopa claims to be a contract, was signed by Grasso individually with no reference to Selgar, the holder of the title. Moreover, there is nothing in the record to indicate that the Lopas knew who the proper owner was when the alleged contract was entered into. Since Selgar is not technically a party to the agreement, Grasso's ability to bind the corporation is in doubt.

A memorandum is defective if the corporate owner is not shown to be a party to it. *Slavit Furniture Co. v. Eisenberg*, 129 N.Y.S.2d 18 (Sup.Ct.), *aff'd*, 284 A.D. 1052, 135 N.Y.S.2d 732 (2d Dept.1954). An act by a president of a defendant corporation is not sufficient to identify the responsible party. *Id.* at 20. In *Terrace Court Realty, Inc. v. Fifth Ave. Realty Corp.*, 27 Misc.2d 1061, 209 N.Y.S.2d 22 (Sup.Ct. 1960), the alleged contract of purchase and sale of a parcel of land did not identify the corporate owner as a contracting party in the writing. The plaintiff asserted that the individual defendant acted with the consent and knowledge and at the direction of the corporate defendant. The court rejected the argument stating that an undisclosed principal cannot be held liable. Parol evidence showing the defendant corporation was mentioned by name in the oral negotiations was not admissible where the writing was silent.

Another case on point is *Hasenfratz v. Berger Apartments, Inc.*, 61 N.Y.S.2d 12 (Sup.Ct.1946). Here, Morris Berger signed a memorandum in his name rather than as president of the owner, Berger Apartments, Inc. The court acknowledged that the defendant was a corporation created for the purpose of buying and selling real estate and that by virtue of his office, Berger had the implied power to enter into a contract for the sale of corporate realty without written authorization. The court,

however, did not enforce the contract against the defendant corporation, because there was no indication that Berger was acting in any way other than in an individual capacity. *Id.* at 15. The rule, as quoted in *Hasenfratz* in fuller text, is set forth in 37 C.J.S. *Frauds, Statute of* § 207 (1943).

A signature of an individual who is an incorporator, officer, director, or agent of a corporation, which is intended to be an individual signature, or which is not shown to be made on behalf of the corporation, suffices as an individual signature, but not as a corporate signature, within the meaning of the statute of frauds.

In the present case, the very fact that only two of the three lots referred to in the writing are owned by the debtor herein, evidences the fact that Grasso was signing as an individual rather than as an alter ego of Selgar. The third property, a vacant lot, is purportedly owned by a separate corporation controlled by Grasso but otherwise unrelated to this debtor, and therefore not subject to the jurisdiction of this court. Thus, the court must hold that the debtor-in-possession cannot be bound by the acts of Grasso. The court, however, is mindful of its role as an equitable forum and will examine all the facts and circumstances regardless of this deficiency.

■ The Statute of Frauds for real property in New York is found in the General Obligations Law § 5–703(2), which provides:

A contract for the leasing of a longer period than one year, or for the sale, of any real property, or an interest therein, is void unless the contract or some note or memorandum thereof, expressing the consideration, is in writing, subscribed by the party to be charged, or by his lawful agent thereunto authorized in writing.

The general rule in New York as to the sufficiency of a written memorandum to meet the requirements of the statute is that it must state the entire agreement with such certainty that the substance thereof will be known from the writing and it must designate the parties, identify the subject matter, and state all of the essential terms of a complete agreement. *Aceste v. Wiebusch,* 74 A.D.2d 810, 425 N.Y.S.2d 369 (2d Dept.1980).

It is well settled that binders and memoranda are sufficient to bind the parties if the essential terms are included. *Marat Corp. v. Abrams,* 15 N.Y.2d 1002, 207 N.E. 2d 611, 260 N.Y.S.2d 17 (Ct.Appeals 1965); *Read v. Henzel,* 67 A.D.2d 186, 415 N.Y. S.2d 520 (4th Dept.1979); *Wilder v. Subrina Wash, Inc.,* 61 A.D.2d 823, 402 N.Y.S.2d 58 (2d Dept.1978). In fact, courts will often enforce a binder when a term is left out if it may be implied. *Fatoullah v. Schneider,* 103 A.D.2d 957, 479 N.Y.S.2d 804 (3d Dept.1984) (failure to include amount of money required for mortgage in mortgage contingency clause did not render document insufficient); *Boyajian v. Casey,* 52 A.D.2d 1014, 383 N.Y.S.2d 714 (3d Dept.1976) (parol evidence allowed to pinpoint boundaries of a lot where description was vague); *Birnhak v. Vaccaro,* 47 A.D.2d 915, 367 N.Y.S.2d 792 (2d Dept. 1975) (omission of a closing date not a fatal defect). The severity of a missing term must be weighed in the context of the entire agreement.

Turning to the writing at issue in this proceeding, the defendant asserts that the document fails to meet the requirements for a valid contract in both form and substance. This court agrees. An examination of the writing in the appointment book exposes many deficiencies and does not conclusively express the intent of the parties.

As shown above, the alleged contract has not been signed by Selgar, the party to be charged. The defendant is not a party to this agreement and cannot be liable for its terms. As a matter of law, this departure from the requirements of the Statute of Frauds voids the transaction.

The writing also fails to decisively show an intention on the part of Grasso that his signature apply to the writing of Lopa in addition to his own. The division of the page by the heavy black line evinces a possibility that two separate memoranda were contemplated. This interpretation is furthered by the duplication of terms in the

two blocks such as the amount of the deposit and the description of the lots. Acceptance of this theory would end any discussion since the middle block signed by Grasso, the party to be charged, is visibly lacking the essential terms. The uncertainty is compounded by the testimony of Grasso that the page was empty when he wrote the incomplete statement that bears his signature. The intent to integrate the two blocks into one document would have been better shown by either incorporating the two writings by reference or by making the entire record in one handwriting, subscribed by both parties at the end of the agreement.

An essential term possibly omitted from the memorandum is that of tenancies. There has been no testimony as to whether there were any tenants in the buildings at the time of this agreement, but this court is aware of the existence of tenants at the time of the filing of the petition in bankruptcy. If such tenancies continued until the time of "sale," their treatment should be part of the agreement.

The final essential term omitted from the alleged contract is a provision that the sale is subject to approval by the bankruptcy court. The plaintiffs claim that Selgar contracted for the sale of the real property in the ordinary course of business pursuant to 11 U.S.C. § 363(c)(1) and therefore did not need to provide notice or request a hearing before cementing the deal.[1]

■ The purpose behind the ordinary course of business rule in § 363 is to allow a business to continue its daily operations without incurring the burden of obtaining court approval or notifying creditors for minor transactions, while at the same time protecting secured creditors and others from the dissipation of the estate's assets. H.R.Rep. No. 595, 95th Cong., 1st Sess. 181–82 (1977), 1978 U.S.Code Cong. & Admin.News, 5787, 6141–6143. Inherent in this purpose is the intent that the debtor

maintain the value of its ongoing business while formulating a plan of reorganization. In all other circumstances, where these goals are not furthered, a debtor should first seek an order from the court before engaging in any transaction.

■ Selgar was engaged in the business of renting realty at the commencement of the bankruptcy case. The petition for relief lists the debtor's business as, "Rental of income producing commercial buildings." Similarly, the Rule 11 affidavit filed with this court describes its activities as rental of commercial and residential properties. A post-petition increase in the vacancy rate or a decrease in value of rental property does not entitle the debtor-in-possession to change its business purpose to include the buying and selling of real property.

Subsequent to the filing of the Chapter 11 petition, the debtor-in-possession sold two of its five buildings, both by order of this court. A sale such as the one in issue would cause a two-thirds reduction in the debtor's "inventory." The sale of a substantial part of a debtor's inventory is not in the ordinary course of business since it is not in the ordinary course to engage in one's own liquidation. *In re United Puerto Rican Food Corp.*, 41 B.R. 565, 572 (Bkrtcy.E.D.N.Y.1984).

Additionally, the transfer of a primary asset of the debtor is not a routine, ordinary course of business matter, and compliance with notice and hearing requirements of § 363 is mandatory. *In re Fountain Bay Mining Co.*, 46 B.R. 122, 124 (Bkrtcy. W.D.Va.1985). It is not difficult to see that creditors could be severely prejudiced if a debtor-in-possession were given the broad authority to sell a majority of its assets to one buyer without giving the court and the creditors an opportunity to examine the price and other terms for fairness and the possibility of receiving more for the creditors in a public sale.

---

1. 11 U.S.C. § 363(c)(1) provides:
   If the business of the debtor is authorized to be operated under section 721, 1108, 1304, 1203 or 1204 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

█ Here, the plaintiffs' contention that the proposed sale is in the ordinary course of business is incorrect for the very reason that a court could not approve this sale with the facts before it. Since only two of the three properties in question are included as property of the estate, thus subject to the jurisdiction of this court, and no apportionment of the purchase price to the individual properties has been made, an evaluation of the purported sale's value to the estate cannot be determined. As a practical test for a debtor-in-possession, if a bankruptcy court could not approve a sale as a routine matter without looking to outside sources, the transaction should be considered outside the ordinary course of business and a hearing must be requested.

█ The plaintiffs' final argument is that they are good faith purchasers for value with no knowledge of the commencement of the bankruptcy case at the time of the transaction and therefore have an unavoidable post-petition transfer pursuant to 11 U.S.C. § 549(c).[2] To fall under the protection of § 549(c), the transaction must satisfy the definitional requirements of a transfer. Section 101(50) defines "transfer" as:

> every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

For the reasons stated above, the debtor, Selgar, neither disposed nor parted with its property, thereby taking this alleged contract out of this admittedly broad definition. Furthermore, since the contract price is not apportioned into debtor and non-debtor property, this court cannot rule upon the reasonable equivalent value of the property. Therefore, the court need not reach the difficult factual question of when the Lopas obtained knowledge of the bankruptcy.

For the foregoing reasons, the court must conclude that the purported memorandum of sale is neither valid nor enforceable against the debtor's estate under applicable New York State and Federal Bankruptcy laws.

Submit order in accordance with this decision.

---

2. 11 U.S.C. § 549(c) provides:

The trustee may not avoid under subsection (a) of this section a transfer of real property to a good faith purchaser without knowledge of the commencement of the case and for present and fair equivalent value unless a copy or notice of the petition was filed, where a transfer of such real property may be recorded to perfect such transfer, before such transfer is so perfected that a bona fide purchaser of such property, against whom applicable law permits such transfer to be perfected, could not acquire an interest that is superior to the interest of such good faith purchaser. A good faith purchaser, without knowledge of the commencement of the case and for less than present fair equivalent value has a lien on the property transferred to the extent of any present value given, unless a copy or notice of the petition was so filed before such transfer was so perfected.

EXHIBIT

**Thanksgiving Day** ON OCT. 22, 1984 4:30pm **Thursday 22 NOVEMBER**

FRANK LOFA & ROSENBURG REACH AGREEMENT WITH VIC SERRO TO GIVE HIM 300 DEP + LOFA BINDER FOR THE FOLLOWING BLDS 639 BAY 641-649 CANAL & 647 649 BAY ST PRICE 175,000 TERMS 4,000 ON CONTRACT THIS WEEK, 50,000 CASH + 125,000 MORTAGE SUBJECT TO BANK APPROVAL CLOSING TO TAKE PLACE IN 60 TO 90 DAYS. Frank Lofa Rose Marie Lofa

**Friday 23 NOVEMBER**

Marcello Milone 10/22/84 4:30

$300 Dep FL
639 B44
B44
644 & C43 B44
630 VACANT LOT
ALSO VACANT LOT AS 647-649
KNOWN STI 175,000
BY Vic Caron

**Saturday 24 NOVEMBER**

G. HART
Gusso 948 9204
(Ruano L-1 855 4250

**Sunday 25 NOVEMBER**