The UNITED STATES of America ex
rel. C. Bennett HARRISON,
Successor Trustee,

v.

ESTATE OF Irwin A.
DEUTSCHER, et al.

In re H & S
TRANSPORTATION CO., INC.

No. 3:84–0705.

United States District Court,
M.D. Tennessee,
Nashville Division.

June 6, 1990.

## MEMORANDUM

WISEMAN, Chief Judge.

This is an action to recover on a bond issued by defendant The Aetna Casualty & Surety Company (Aetna) to ensure the faithful performance of defendant Irwin A. Deutscher[1] as trustee of the estate in bankruptcy of H & S Transportation Company, Inc. (H & S). On September 4, 1981, H & S commenced a voluntary case in the Bankruptcy Court for the Middle District of Tennessee under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101–1174. Mr. Deutscher was appointed as trustee on October 16, 1981, and served as trustee until the successor trustee, C. Bennett Harrison, Jr., was appointed on October 6, 1983. The successor trustee has filed this action, seeking repayment of expenditures allegedly disbursed in violation of the Bankruptcy Code.

The Complaint alleges three causes of action. In Count I, plaintiff seeks to recover expenditures for which Mr. Deutscher allegedly failed to obtain proper approval from the Bankruptcy Court. Both sides have moved for summary judgment on this count. Defendants argue that Mr. Deutscher incurred the challenged expenses while operating the debtor's business, as he was authorized to do under 11 U.S.C. § 1108. Consequently, the defendants argue that Mr. Deutscher was not required to obtain court approval for the expenses. Plaintiff argues that the challenged expenses arose solely out of Mr. Deutscher's performance of his duties under 11 U.S.C. § 1106, and therefore required court approval under 11 U.S.C. § 330.

In Count II, plaintiff seeks recovery of fees paid to court-approved professional persons on the grounds that Mr. Deutscher obtained the appointment of the persons in violation of 11 U.S.C. § 327. Defendants have moved for summary judgment on this count, arguing that this claim is barred by the doctrine of res judicata, or claim preclusion, because the plaintiff had an opportu-

C. Bennett Harrison, Jr., W. Gregory Miller, Cornelius, Collins, Higgins & White, Nashville, Tenn., for U.S. ex rel. C. Bennett Harrison.

Douglas M. Fisher, Tracy Shaw, Howell, Fisher, Branham & North, Nashville, Tenn., for Aetna Cas. & Sur. Co., Deutscher Estate and Tom Pinckney.

---

**1.** By Order entered April 12, 1990, because of Mr. Deutscher's death, Mr. Deutscher's estate was substituted for him as a party defendant.

nity to litigate the matter in previous proceedings that were litigated to a judgment in the Bankruptcy Court. Plaintiffs contend that the doctrine does not apply because the judgment upon which defendants' argument relies was compromised and settled while an appeal was pending.

In Count III, expressed as an alternative to Count I, plaintiff seeks recovery of funds that allegedly were disbursed according to an office and expense sharing arrangement and were neither actual or necessary as required under 11 U.S.C. § 330. Defendants have moved for summary judgment on this count as well. They contend that their arguments in favor of their motion on Count I apply equally to Count III, and that, in any event, plaintiffs have failed to come forward with any evidence to support their claim that the expenses were neither actual or necessary. Plaintiff has also moved for summary judgment, arguing that defendants bear the burden of demonstrating that the challenged expenditures were both actual and necessary, and that defendants have failed to produce any evidence to raise a genuine issue of material fact on this matter.

## FACTUAL BACKGROUND

H & S was one of five related river transportation companies controlled by the same three men. The other companies were Inland Transportation Co., Riverline, Inc., River Management, Inc., and River Merchandising, Inc. Each of the five corporations was involved in some aspect of the river transportation business on the United States' inland waterway system. Inland owned and chartered towboats to transport barges. River Line and River Management supplied the barges, chartering them to ship freight on the system. Although H & S owned two towboats and three oil barges, primarily it provided personnel to operate the towboats. River Merchandising traded freight contracts to move bulk grain commodities. *In re H & S Trans. Co., Inc.*, 55 B.R. 786, 788 (Bankr. M.D.Tenn.1982); *In re H & S Transportation Co., Inc.*, 53 B.R. 128, 130 (Bankr.M.D.Tenn.1985) (Exhibit C to Defendants' Memorandum in Support of Motion for Summary Judgment (Defendants' Memorandum)). All five businesses eventually filed Chapter 11 petitions, commencing cases known collectively as the "barge cases." On April 23, 1982, Mr. Deutscher was appointed as trustee in four of the five bankruptcy cases. *See In re H & S*, 55 B.R. at 788. The cases were not consolidated.

When Mr. Deutscher became trustee for H & S, its affairs were in disarray. H & S had ceased operations. Boats were scattered about at different points along the Mississippi River and in serious disrepair. Insurance on the boats had lapsed for nonpayment of premiums. Crews had left the vessels because H & S had not paid their wages. Creditors were threatening to repossess the vessels, had filed or claimed maritime liens against the vessels, and had commenced litigation against H & S. The company was maintaining expensive, nonproductive offices in Memphis. The company's books and records, including accounts receivable, were in disarray. The company was not collecting accounts receivable. Also, the company was part of an inter-corporate cash management system where all of its receipts and disbursements had been channelled through an account at Citizens Bank of Hendersonville known as the "JWA Master Account." *See* Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment (filed December 15, 1989) (Plaintiff's Brief), Exhibit A, Trustee's Statement in Support of His Fee Application (Fee Application).

J.W. Armstrong, Jr., one of the controlling parties and an equity shareholder in the five river companies, had set up the "Master Account" with the assistance of John Miller, a certified public accountant. The account pooled the resources of the five river companies and approximately 15 other companies in which Mr. Armstrong had ownership interests. Under Mr. Miller's supervision, the receipts of and disbursements from each of the companies passed through this account. This resulted in frequent inter-company transfers and transactions. As of August 1981, the ac-

count contained a balance of approximately $759.31. In spite of the arrangement's complexity, Mr. Miller had prepared no monthly reports of the debtor corporations' business affairs. *In re H & S*, 55 B.R. at 788–89.

In his fee application, Mr. Deutscher states that he took several steps to correct the conditions at H & S. He states that he located the debtor's boats, retrieved them to a central location, obtained proper insurance and installed proper crews and maintenance and security systems. He says that he analyzed the debtor's accounts, books, and records for possible claims against debtors and for defenses against actions instituted by creditors, and that he negotiated with the secured lender to retain possession of the towboats and defended, reached agreement on or removed to Bankruptcy Court pending litigation. He also moved the debtor's offices from Memphis to Nashville. Fee Application at 2. Mr. Deutscher also represented in his fee application that he succeeded in orderly liquidating equipment for the benefit of creditors, instituting and collecting on preference litigation, organizing and commencing efforts to collect accounts receivable, obtaining a restraining order preventing assets from being moved, generating income through proper cash management, and saving money by moving offices to Nashville. *Id.* at 3.

Mr. Deutscher was a trustee in several Chapter 11 cases. He has testified that his philosophy as a trustee was to keep a debtor operating because it facilitated collection of the debtor's assets and improved its marketability for sale as a going concern. Deutscher also testified that he attempted to put H & S back into business. According to Mr. Deutscher, however, the cost to insure operational boats and the failure of the Mississippi to rise made that infeasible. Thus, although Mr. Deutscher succeeded in generating interest income and collecting outstanding obligations from debtors to H & S, H & S did not generate any income from using equipment or providing services after it commenced its bankruptcy case. It appears from the record that Mr. Deutscher attempted to negotiate contracts for H

& S, but closed no deals because he could not obtain profitable agreements. Eventually, Mr. Deutscher sold the debtor's assets. *See* Deutscher Deposition I at 186–87 (July 11, 1984); Deutscher Deposition II at 69–74 (August 27, 1984).

To assist him in his efforts as trustee, Mr. Deutscher used the services of several people. Mr. Deutscher maintained a permanent staff and office to operate his accounting and financial consulting business. As he did in several other bankruptcy cases in which he served as a trustee or examiner, Mr. Deutscher moved several personnel from his regular staff into various segments of H & S's business. Fee Application at 2–3. *See generally In re Hendersonville Bowling Center, Inc.*, 65 B.R. 963, 963–66 (Bankr.M.D.Tenn.1986) (Ray, J., by designation) (describing Mr. Deutscher's method of transferring staff to work on Chapter 11 cases). The primary personnel from his staff included a licensed public accountant, to sort out receivables, possible preference payments and the cash management system, Deutscher Deposition I at 91–92; accountants to "dig into the company," reconstitute accounts receivable, sort out the cash management account, and figure out inter-company relationships, *id.* at 89; and a variety of other office personnel. Mr. Deutscher also employed John Heldreth of Continental Enterprises, who was in charge of equipment, security, and finding assets. *Id.* at 88–89. *See also* Listing of Major Personnel Utilized (attached to Fee Application). Mr. Deutscher testified that he also employed one accountant for about six months who was working for H & S at the time H & S filed its petition. It appears from the record that this accountant was Mr. Miller, who oversaw the creation of the JWA Master Account, and that although he was familiar with the financial affairs of all five "barge" estates, he was actually employed by River Transportation, the estate over which Mr. Deutscher was not a trustee.

Mr. Deutscher obtained court approval to employ only one accountant, James A. Allen. Mr. Allen is a certified public accountant, but nothing in the record demonstrates

that he provided any services to, or received compensation from, the estate. Mr. Deutscher also used attorneys, whom the Bankruptcy Court approved.

While he was trustee, Mr. Deutscher disbursed $598,300.26 from the debtor's estate. That amount comprises $172,189.82 in court-approved legal and auction fees, $50,000.00 as a proper adjustment for an allocation error, $89,363.78 that the estate has recouped, and $286,746.66 in unapproved and unreimbursed expenditures. Nothing in the record indicates whether, or to what extent, the money disbursed was "cash collateral" under 11 U.S.C. § 363(a).

Under Counts I and III, plaintiff seeks to recover the last category of expenditures. A significant portion of these expenditures were disbursed according to Mr. Deutscher's office and expense sharing system. In a nutshell, under this system, Mr. Deutscher paid the salaries and wage taxes of the employees transferred to work on the H & S matter from the debtor's estate. In addition, Mr. Deutscher disbursed from the estate a share of the overhead for the maintenance of his office, including rent for space and equipment, delivery costs, library costs, receptionist, secretarial and clerical staff, benefits, parking, supplies and postage. He arrived at the estate's share by totalling the expenses and prorating them among his "major operating" Chapter 11 cases.[2]

The claim for attorneys' fees under Count II arises out of Mr. Deutscher's appointment as trustee to three of the other "barge cases" in April 1982. The Bankruptcy Court reasoned that because of the substantial interrelation between the debtor corporations and Deutscher's familiarity with their operations, appointing Mr. Deutscher as a single trustee would be beneficial to the estates. *In re H & S Trans. Co.*, 55 B.R. at 791. The Bankruptcy Court also approved the appointment of a law firm, Waddey, Lundin, and Newport, as attorneys in all four cases. In January 1983, over the objections of some creditors,

the Bankruptcy Court awarded interim fees of $125,000.00 to the law firm. Subsequently, Deutscher was removed as trustee in all the "barge cases" and separate successor trustees were appointed for each case. In appointing successor trustees, the Bankruptcy Court "commend[ed] the trustee and his attorney for bringing this matter [of possible conflicts] before the court and thereby insuring that these estates are expeditiously administered without conflicts of interest, real or apparent." No. 3–81–02803, Slip op. at 3 (Oct. 6, 1983) (Defendants' Memorandum, Exhibit B). On February 8, 1985, over the successor trustee's objections, the Bankruptcy Court awarded fees to the law firm, noting,

> The applicant represented this trustee in each of the four estates he jointly administered. This court has found that the applicant represented interests parallel to that of the H & S estate. Just as the appointment of a single trustee in these four estates was beneficial and efficient, the appointment of a single law firm to represent the trustee was also beneficial and efficient.

53 B.R. at 133 (1985) (Defendants' Memorandum, Exhibit C). This judgment was appealed, then compromised while the appeal was pending, with the law firm accepting a reduced fee as a final award.

The successor trustee eventually filed this suit against Mr. Deutscher. This suit has been consolidated with the bankruptcy proceeding contesting Mr. Deutscher's fee application. While part of the record, the fee application is not currently at issue.

## ANALYSIS

The motions before the Court present three issues. First, did Mr. Deutscher act within his authority as trustee when he disbursed from the debtor's estate the funds at issue in Counts I and III? Second, in these circumstances, was Mr. Deutscher required to obtain court approval before employing accountants to assist him in administering the debtor's estate?

---

**2.** Deutscher's allocation system was detailed and disapproved in *In re Hendersonville Bowling Center, Inc.*, 65 B.R. 963 (Bankr.M.D.Tenn.

1986). *See also* Deutscher Deposition II at 51–70, 73–86, 90–93, 95–98.

Third, do the principles of res judicata bar plaintiff's claim for the return of attorneys' fees?

## I. MR. DEUTSCHER EXCEEDED HIS AUTHORITY UNDER THE BANK-RUPTCY CODE IN DISBURSING FUNDS AT ISSUE UNDER COUNT I.

█ Section 1108 authorizes the Chapter 11 trustee to operate the debtor's business "unless the court, on request of a party in interest and after notice and a hearing, orders otherwise." *Id.* at § 1108. Section 1108 contemplates that operation of the business is the rule, so that it is not necessary for the trustee to obtain from the court an order authorizing operation. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 404; Sen.Rep. No. 95–989, 95th Cong., 2d Sess. 116, U.S.Code Cong. & Admin.News 1978, p. 5787. The court may order the trustee to cease operations, but it may not condition the trustee's management of the estate or order the trustee to continue operating the business. Although the trustee has a fiduciary duty to operate the business if it is necessary to preserve the value of the estate, and "to cease operations where continued operations will deplete the debtor's estate with no reasonable prospects of rehabilitation," *Collier on Bankruptcy,* para. 1106.01[5][d], courts afford the trustee far-reaching discretion to operate, modify, or cease the debtor's business. *See, e.g., In re Curlew Valley Associates,* 14 B.R. 506 (Bankr.D.Utah 1981). Relying upon *Curlew Valley,* defendants argue that Mr. Deutscher properly exercised his discretion to operate the business after he was appointed trustee, and contend that

this Court should not enter the business arena and decide whether Deutscher should have moved for immediate liquidation or whether he properly investigated and operated the H & S business with the hope of rehabilitating it and making it a viable enterprise.

But the issue presented in *Curlew Valley* and argued by defendants differs from the issue presented by plaintiff's claim. In *Curlew Valley,* the debtor sought to enjoin the trustee from substituting hay baling for hay cubing on the grounds that the

trustee's modification was injurious to the estate. The court refused to issue the injunction, holding that it "will not entertain objections to a trustee's conduct of the estate where that conduct involves a business judgment made in good faith, upon a reasonable basis, *and within the scope of his authority under the Code.*" *Id.* at 513–14. (Emphasis supplied.) The issue presented to this Court is not whether Mr. Deutscher's business judgment was sound, but whether Mr. Deutscher acted within the scope of his authority under the Code when he disbursed funds from the estate without notice, hearing or court approval.

█ Whether Mr. Deutscher acted within the scope of his authority is controlled by section 363 of the Bankruptcy Code. Under section 363(b), the trustee "after notice and a hearing, may use, sell, or lease, *other than in the ordinary course of business,* property of the estate." (Emphasis supplied.) Section 363(c)(1) provides that absent a court order to the contrary,

the trustee may enter into transactions, including the sale or lease of property of the estate, *in the ordinary course of business, without notice or a hearing,* and may use property of the estate *in the ordinary course of business without notice or a hearing.*

(Emphasis supplied.) But the trustee may not sell, lease or use "cash collateral," even in the ordinary course of business, without either obtaining the consent of interested parties or obtaining court approval after notice and a hearing. *Id.* at § 363(c)(2). Thus, determining whether Mr. Deutscher was required to provide notice and an opportunity for a hearing and to obtain court approval depends on two factors: whether the transactions at issue involved "cash collateral" and whether they were outside the ordinary course of the debtor's business.

"Cash collateral" includes

cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest

and includes the proceeds, products, offspring, rents, or profits of property subject to a security interest ...

*Id.* at 363(a). Mr. Deutscher did not obtain the court's approval or creditors' consent before disbursing the funds at issue. Therefore, to the extent the funds are "cash collateral," he exceeded his authority under the Bankruptcy Code. The record currently before the Court, however, is insufficient to support a determination of whether, or to what extent, third parties had an interest in the disbursed funds.

Regardless of whether the funds at issue are "cash collateral," Mr. Deutscher exceeded his authority under the Bankruptcy Code if the payments were outside the ordinary course of the debtor's business. *Cf. Mark IV Prop., Inc. v. Club Dev. & Mgmt. Corp. (In re Club Dev. & Mgmt. Corp.)*, 27 B.R. 610, 612 (9th Cir.BAP 1982) (business judgment is not a statutory grounds for approving administrative costs incurred out of the ordinary course of business). Neither the Bankruptcy Code nor the legislative history of § 363 provide guidelines for identifying ordinary course transactions. Courts have recognized that the concept of "ordinary course of business" comprises at least two dimensions. *See generally Burlington Northern R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 704–05 (9th Cir.1988), *rev'g*, 67 Bankr. 360 (D.Ore.1986); *Committee of Asbestos-Related Litigants and/or Creditors v. Johns–Manville, Corp. (In re Johns–Manville Corp.)*, 60 B.R. 612, 616 (Bankr.S.D.N.Y.1986); *Johnston v. First St. Cos. (In re Waterfront Cos. Inc.)*, 56 B.R. 31, 34–35 (Bankr.D.Minn.1985). The "vertical dimension" focuses on the debtor's internal operations, comparing the debtor's prepetition business with its postpetition conduct. *E.g., Dant & Russell*, 853 F.2d at 705; *Johns–Manville*, 60 B.R. at 617 (both citing *In re DeLuca Dist. Co.*, 38 B.R. 588 (Bankr.N.D.Oh.1984) and *In re County Line Homes, Inc.*, 43 B.R. 440 (E.D.Mo.1984)). *See generally Armstrong World Ind., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 394 (S.D.N.Y.1983). In comparing prepetition and postpetition conduct, the vertical dimension assumes the perspective of a hypothetical creditor and assesses whether the transaction at issue subjects the creditor to economic risks of a nature different from those accepted when credit was extended. *Johns–Manville*, 60 B.R. at 616. Under this test, the size, nature and type of the business, and the size and nature of the transactions in question are relevant to determine whether the transactions are ordinary. *Id.* at 617; *Waterfront*, 56 B.R. at 35.

The "horizontal dimension" involves an industry-wide perspective and compares the debtor's business to other like businesses. *Dant & Russell*, 853 F.2d at 704. Derived primarily from caselaw interpreting other code sections, this dimension compares whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business. *Id.; Johns–Manville*, 60 B.R. at 618; *Waterfront*, 56 B.R. at 35. Under this test, a transaction occurs in the ordinary course when there is a showing that the transaction is the sort occurring in the day-to-day operation of the debtor's business, or businesses like it. *E.g., Johns–Manville*, 60 B.R. at 618. For example, "raising a crop would not be in the ordinary course of business for a widget manufacturer because that is not a widget manufacturer's ordinary business." *Waterfront*, 56 B.R. at 35.

Defendants suggest that any money spent by Mr. Deutscher that was related to the "operation" of the business, as defined in section 1108, was spent in the ordinary course and did not require notice or court approval. To the extent defendants seek a broad definition of "ordinary course," their argument has some merit.

The "ordinary course of business" standard is purposely not defined so narrowly as to deprive a debtor of the flexibility it needs to run its business and respond quickly to changes in the business climate. Title 11 procedures are not meant to straitjacket a debtor, and a debtor must be allowed to marshall assets on an "as needed" basis. The policy behind the Code recognizes that the debt-

or needs a certain degree of freedom on its road to reorganization so that it might avoid precisely those pitfalls which brought it into bankruptcy initially. *Johns–Manville*, 60 B.R. at 617.

But the policy of affording the debtor or trustee flexibility is subsidiary to the overriding goal of maximizing the value of the estate. To achieve the overriding goal, the Code balances the trustee's flexibility against the need to restrain the costs occasioned by the debtor's petition. For example, although the Bankruptcy Court has broad discretion to grant a claim administrative priority, that discretion is limited by the requirement of § 503(b)(1)(A) that only actual and necessary costs of preserving the estate receive priority. *E.g., Dant & Russell*, 853 F.2d at 707; *In re Dakota Ind., Inc.*, 31 B.R. 23, 26 (Bankr.D.S.D. 1983). Section 363 is designed to strike this balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets. H.R.Rep. No. 595, 95th Cong., 1st Sess. 181–82 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News, 5787, 6141–43; *Lopa v. Selgar Realty Corp. (In re Selgar Realty Corp.)*, 85 B.R. 235, 240 (Bankr.E.D.N.Y.1988). Thus, the authorization in § 363 that the trustee may use property of the estate in the "ordinary course of business" without notice or a hearing cannot be construed to permit payments that frustrate the theory and philosophy of the Bankruptcy Code. *Pressman v. Bank of St. Louis (In re J.T.L., Inc.)*, 36 B.R. 860, 862 (Bankr.E.D. Mo.1984). *See Employee Transfer Corp. v. Grigsby (In re White Motor Co.)*, 831 F.2d 106 (6th Cir.1987) (does not authorize conversion of prepetition debt to postpetition debt); *Lopa v. Selgar Realty Corp. (In re Selgar Realty Corp.)*, 85 B.R. 235, 240 (Bankr.E.D.N.Y.1988) (does not authorize sale of primary asset without notice and hearing); *In re Chips 'n Twigs, Inc.*, 58 B.R. 109, 112 (Bankr.E.D.Pa.1986) (does

not authorize payment of expenses where estate is insufficient to cover all similar expenses); *Waterfront*, 56 B.R. at 34–35 (does not authorize agreement to indemnify partners of debtor); *J.T.L.*, 36 B.R. at 862 (does not authorize postpetition payment of interest on prepetition note). Rather, the Court must interpret whether payments were made in the "ordinary course of business" with sensitivity to the Code's overriding policy of maximizing the value of the debtor's estate for the benefit of the creditors.

Mr. Deutscher inherited a moribund business. Mr. Deutscher was, nevertheless, authorized under § 1108 to operate the business, and made efforts to rejuvenate it. The fact that his efforts failed to generate any income from the sale of services or use of equipment does not entail that all of his use of the debtor's property occurred outside the ordinary course of the debtor's business.[3] Mr. Deutscher brought the debtor's boats to a common place, repaired the boats, placed crews on the boats, reinstated their insurance, instituted a proper maintenance program, and attempted to negotiate contracts selling the services of H & S. These actions were not out of the ordinary for a business such as H & S. Nor did they diverge so far from the debtor's prior practices that they subjected the creditors to unexpected risks. Further, although these actions are consistent with Mr. Deutscher's duty as trustee, requiring prior approval before financing these activities may have frustrated Mr. Deutscher's ability to complete the tasks successfully, to hire and retain crews, to negotiate favorable insurance or supplies contracts, or to exploit favorable business opportunities had they arisen. Thus, viewed from either the horizontal or vertical perspective, these actions were taken in the ordinary course of the debtor's business.

To the extent that Mr. Deutscher used "cash collateral" to finance these activities, he exceeded his authority under the Code.

---

**3.** This course of events, however, necessarily limits the scope of the debtor's ordinary course of business. *Cf., e.g., In re Hanson Ind., Inc.*, 90 B.R. 405, 414–15 (Bankr.D.Minn.1988) (disapproving attorneys fees on behalf of debtor with little or no functioning business, and citing cases).

11 U.S.C. § 363(c)(2). On the other hand, Mr. Deutscher was authorized to pay crews, insurance, fuel, maintenance and towing costs, and to pay for supplies without providing notice and a hearing. As explained below, however, Mr. Deutscher was not authorized to reimburse or compensate himself, his staff, or other "major personnel utilized" for activities in relation to these activities.[4]

■ The debtor's petition produced a flurry of activity. The activity arose not out of a rejuvenation of the debtor's business, however, but out of Mr. Deutscher's performance of his duties as the administrator of the estate. In addition to the actions noted above, Mr. Deutscher says that he analyzed the debtor's accounts, books, and records for possible claims against debtors and for defenses against actions instituted by creditors, instituted collection actions, investigated the debtor's financial affairs, negotiated with the secured lender to retain possession of the towboats and defended, reached agreement on or removed to Bankruptcy Court pending litigation. Each of these activities is specifically required under the Bankruptcy Code and is part of the administration, not the operation, of the estate. 11 U.S.C. § 1106. This is especially so where, as in this case, the business is not operating.

The flurry of administrative activity occasioned by the debtor's petition is common in bankruptcy. Although this activity is typically necessary to remedy conditions that have precipitated the debtor's petition, it also requires that precious resources be drawn from a debtor who is already in a precarious financial condition. Consequently, the overriding policy of maximizing the value of the estate for the protection of the creditors' interests "requires careful circumscription of costs of administration, particularly those that divert assets to the administrators rather than the beneficiaries." *In re McAuley Textile Corp.*, 11 B.R. 646, 647 (Bankr.Me.1981). Section 330 embodies this policy. Section 330 re-

quires court approval after notice and a hearing before professionals, the trustee and paraprofessionals employed by the trustee or professionals may be compensated for "actual and necessary services rendered" and reimbursed for "actual and necessary" expenses.

Defendants' argument that Mr. Deutscher was authorized without notice or a hearing to direct assets to the administrators of the estate frustrates the fundamental concern for circumscribing the costs of administering the estate. Nor is the argument justified by the counterbalancing policy of affording the trustee flexibility to operate the business without undue court or creditor interference. In disbursing without notice, a hearing or court approval, estate funds to himself, to persons employed to assist him in administering the estate, and to finance the operation of his office, Mr. Deutscher exceeded his authority under the Code.

## II. MR. DEUTSCHER WAS REQUIRED TO OBTAIN COURT APPROVAL BEFORE EMPLOYING ACCOUNTANTS.

■ Plaintiff also contends that Mr. Deutscher failed to obtain proper court approval before hiring accountants to assist him in the administration of the estate. This aspect of plaintiff's claim is controlled by § 327. Section 327(a) requires the trustee to obtain court approval before employing professional persons, including attorneys, accountants, appraisers and auctioneers. Section 327(b) qualifies 327(a), providing that where the debtor's business is authorized to be operated, "and if the debtor has regularly employed [professionals] on salary, the trustee may retain or replace such professional persons if necessary in the operation of such business." 11 U.S.C. § 327(b). The parties agree that the accountants at issue are professionals within the meaning of this section. Defendants argue, however, that court approval was not necessary because the debtor previous-

---

**4.** Had Mr. Deutscher provided proper notice and no interested party had objected, court approval may not have been necessary. *See, e.g.,* *In re Hanline*, 8 B.R. 449 (Bankr.N.D.Ohio 1981).

ly employed an accountant on salary. Defendants also argue that Deutscher in fact obtained approval to hire Mr. James Allen, a certified public accountant.

■ The Court disagrees with defendants. First, it is true that Mr. Allen was approved by the Bankruptcy Court. But nothing in the record indicates that Mr. Allen performed any services for the estate or that any payments to Mr. Allen are currently at issue. Therefore, Mr. Allen's approval is irrelevant to this claim. Second, nothing in the record supports the claim that the debtor had employed an accountant on salary before commencing the case. Although an accountant was integral to establishing and administering the JWA Master Account, he was not a salaried employee of H & S. In accordance with the need to control administrative costs, the exception in § 327(b) to the requirement that the court approve the employment of professionals must be narrowly construed. Defendants have failed to show that Mr. Deutscher acted in accordance with the § 327(b) exception. Third, even if H & S had employed an accountant on salary before commencing the case, § 327(b) does not provide license to replace a single accountant with six. Such an action is extraordinary, and requires prior court approval.

### III. PLAINTIFF'S CLAIM IN COUNT II IS BARRED BY THE PRINCIPLES OF RES JUDICATA.

■ Defendants have moved for summary judgment on Count II. Plaintiffs claim that Mr. Deutscher violated § 327 by obtaining approval of attorneys to represent him in all four "barge" cases even though he knew that the attorneys were not "disinterested." Defendants rely on principles of res judicata, arguing that the prior proceedings in the Bankruptcy Court preclude this claim. Specifically, defendants rely on the Bankruptcy Court's order of February 8, 1985, awarding fees to the attorneys representing Mr. Deutscher. In that order, the court held,

> Just as the appointment of a single trustee in these four estates was beneficial and efficient, the appointment of a single

law firm to represent the trustee was also beneficial and efficient. Accordingly, the court holds that the [attorneys] complied with the requirements of 11 U.S.C. § 327.

Defendants' Memorandum, Exhibit C at 13. Plaintiff argues that this finding has no preclusive effect because the judgment was subsequently appealed, and compromised pending appeal. Plaintiff argues that "[i]ssue preclusion ... seems inappropriate if a trial court has actually decided an action on the merits but the parties have settled pending appeal." C. Wright, A. Miller, and E. Cooper, 18 Federal Practice and Procedure § 4443 (1981). Plaintiff argues that to rule otherwise would have a chilling effect on settlements. *See id.* The Court does not agree, and grants defendants' motion for summary judgment.

Nothing in the settlement agreement compromising the prior litigation indicates an intention to vacate the court's findings. Plaintiff could have avoided any preclusive effect by having the court's judgment vacated before entering the settlement. *See, e.g., Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 578 F.Supp. 911, 919–21 (S.D.N.Y.1983), *aff'd,* 746 F.2d 112 (2d Cir. 1984). This freedom also undercuts plaintiff's concern about potential chilling effects.

Moreover, plaintiff's claim threatens the integrity of the Bankruptcy Court. The court commended Mr. Deutscher in a separate order for ensuring that the estate was administered without conflicts of interest. Defendants' Memorandum, Exhibit B at 3. The court also held implicitly that the law firm comported with requirements of § 327 when it appointed the firm and awarded interim fees.

Finally, this claim against Mr. Deutscher arises out of the same cause of action as the plaintiff's claim disputing the final award of attorneys' fees. "Claim preclusion treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same 'claim' or 'cause of action.' " *Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.,* 575 F.2d 530, 535 (5th Cir.1978) (citing *Sea–*

*Land Serv., Inc. v. Gaudet,* 414 U.S. 573, 578–79, 94 S.Ct. 806, 811–12, 39 L.Ed.2d 9 (1974). Under this doctrine, the effect of a judgment, whether it be merger or bar, extends to all issues that were raised, or could have been raised, in the prior litigation. *Kaspar,* 575 F.2d at 535. Plaintiff could have joined this claim in the prior litigation disputing the fee award, but elected not to do so. Plaintiff is now attempting piecemeal, to circumvent the prior judgment, and to relitigate his claim in this court.

Plaintiff's claim in Count II threatens the integrity of the Bankruptcy Court, presents a waste of judicial resources, and is barred under the principles of res judicata. Therefore, the Court grants defendants' motion for summary judgment on this Count.

CONCLUSION

For the reasons stated above, the Court grants defendants' motion for summary judgment on Count II. That Count is dismissed.

The Court denies defendants' motion for summary judgment on Count I and grants plaintiff's motion for summary judgment, at least in part. The Court refers this matter to the United States Magistrate to determine which expenditures were disbursed in violation of the Bankruptcy Code, in accordance with the principles set forth above.

Because of the Court's disposition of Count I, it is unnecessary to reach the issues presented in Count III.[5]

---

**5.** To the extent plaintiff raises this Count to prevent the defendant from seeking nunc pro tunc approval in the future, this claim is not ripe. It is not apparent to the Court, however, in light of *In re Hendersonville Bowling Center, Inc.,* 65 B.R. 963 (Bankr.M.D.Tenn.1986), that the defendant would succeed on such a claim.