**In re METROPOLITAN HOSPITAL, Debtor.**

**Bankruptcy No. 89–12542F.**

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 16, 1990.

Randee B. Feldman, Goldberg & Silverman, P.C., Wynnewood, Pa., Lawrence J. Tabas, Michael J. Halprin, Spector Cohen Gadon & Rosen, P.C., for debtor, Metropolitan Hosp.

Douglas J. Smillie, Mary F. Walrath, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for movant, HHL Financial Services, Inc.

Marvin Krasny, Leonard P. Goldberger, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., for Official Committee of Unsecured Creditors.

Robert Levin, Myron Bloom, Adelman Lavine Gold & Levin, Philadelphia, Pa., for Official Bondholders Committee.

William E. Kelleher, Jr., Robert P. Simons, Eckert Seamans Cherin & Mellott, Pittsburgh, Pa., for Provident Nat. Bank, Indenture Trustee.

James J. O'Connell, Kevin Callahan, Asst. U.S. Trustee, Philadelphia, Pa.

## MEMORANDUM OPINION

BRUCE I. FOX, Bankruptcy Judge:

Before me for resolution is the motion of HHL Financial Service, Inc. (HHL) for *nunc pro tunc* approval of its employment by the debtor as a specialized collection agency. By consensual order entered January 25, 1990 I appointed HHL as agent for the debtor, effective as of November 14, 1989 (the date HHL's application seeking appointment was filed). In that order I reserved the question now before me—that of *nunc pro tunc* approval of HHL's appointment, retroactive to July 11, 1989 (the date the petition in bankruptcy was filed). The debtor seeks such retroactive appointment for HHL so that it may receive compensation for services rendered to the debtor over the course of, approximately, four months. Not surprisingly, this request is supported by HHL but opposed by the indenture trustee, the official committees of bondholders and unsecured creditors and the United States Trustee. The relevant facts are in large part not disputed, and may be summarized as follows.

## I.

HHL Financial Services, Inc. is one of the few firms in this area that specializes in the field of health care receivables, providing both billing and collection services to hospitals, including medical assistance ("MA") reimbursement. HHL had provided these services to the debtor at its Parkview Division for, approximately, four or five years prior to April 1989. N.T. at 84–85. HHL's payment for such services was based upon a percentage of its collected billings. In April 1989, a few months prior to the debtor's bankruptcy filing, HHL and Metropolitan Hospital began a series of discussions pertaining to HHL's employment by all three divisions of Metropolitan Hospital (i.e., Central, Parkview, and Springfield). As a result of these discussions, HHL submitted a proposal dated May 5, 1989 which detailed the services HHL would provide to all components of Metropolitan Hospital; these services included comprehensive MA eligibility and billing activities. N.T. at 85–87. The proposal did not, however, address how HHL would be compensated by Metropolitan. The apparent concerns regarding HHL's compensation involved the negotiation of an acceptable manner of payment which would protect HHL, in light of Metropolitan's deteriorating financial condition, and of a payment plan that would not run afoul of applicable state or federal health care law. N.T. at 88–89.

Metropolitan advised HHL on, approximately, June 19, 1989 that it approved of HHL's May 5th proposal and wanted to begin the expanded relationship, subject to an agreement regarding HHL's method of compensation. HHL commenced performing MA services for Metropolitan on June 21, 1989, even though a final agreement had not been signed. N.T. at 90–91. These services involved, *inter alia*, reviewing and securing approval of any deficient MA application previously initiated by Metropolitan, processing new MA applications and resolving all MA accounts previously billed by Metropolitan, except for accounts on the verge of payment. *See* Ex. H–1.

A final proposal, one discussing the services to be performed by HHL and its rate of compensation (which issues had been agreed to as of June 19, 1989) and also addressing the method of payment to HHL was submitted to Metropolitan's general counsel for review on June 26, 1989. N.T.

at 93. (It is not clear from the testimony whether this proposal was negotiated between HHL and Metropolitan, or whether it was prepared by HHL alone before the June 26 submission.) The proposal provided, in part, that all money which HHL collected from Medicaid would be placed into a special account, to which both HHL and Metropolitan would have access. HHL would then be entitled to a percentage of these collected funds. HHL agreed that it could withdraw funds from this joint account only to the extent of the fees earned. Metropolitan communicated its acceptance of this proposal to HHL by way of memorandum dated July 11, 1989 (the date this bankruptcy case commenced). N.T. at 91. A formal agreement between HHL and Metropolitan was executed on July 17, 1989, approximately one week after the petition was filed. *See* Ex. H–1; N.T. at 91.

Mr. Bernberg, regional vice president of HHL, testified that he learned of the bankruptcy between eight and ten days after its commencement (that is, around the time of HHL's signing the agreement with the debtor). N.T. at 92. Bernberg further testified that, upon learning of the bankruptcy and upon the advice of the debtor's general counsel, he contacted debtor's bankruptcy counsel, Lawrence Tabas, Esq., in order to discuss any implications the bankruptcy filing might have upon HHL's agreement with Metropolitan Hospital. Tabas then informed HHL that bankruptcy court approval for its services would be required.[1]

Tabas also advised Bernberg that, subject to his receiving authorization from the debtor which would be sought at an upcoming meeting, he would be prepared to file any necessary paperwork with the bankruptcy court on HHL's behalf so that its employment with the debtor would be certain despite the fact of bankruptcy. N.T. at 93–94.

After this discussion, early in August 1989, Tabas relayed to Bernberg the fact that Randee Feldman, Esq.[2] considered HHL's agreement to be violative of bankruptcy law in that it allowed HHL access to estate property. Tabas then suggested that Bernberg contact Feldman to discuss the matter further, as Tabas could not then proceed on HHL's behalf. N.T. at 94–95.

Bernberg did contact Feldman, who requested some documents and information from HHL, which were provided under cover of letter dated August 16, 1989. *See* Ex. H–2; N.T. at 95–97.[3] This letter also stated that HHL expected to see a draft application for court appointment "within the next few days." No such draft was forthcoming. Instead, on August 24, 1989, Bernberg received a copy of a letter from Feldman to Tabas. *See* Ex. H–3; N.T. at 97. This correspondence discusses Feldman's concerns regarding HHL's employment by the debtor, and suggests that Tabas then had in his possession sufficient information to file an application on HHL's behalf. Specifically, the letter states: "I believe that you now have in your possession all the documentation needed to pre-

---

**1.** This advice differed from that which HHL had received in another bankruptcy case. Because HHL is one of the few entities which is involved in medicaid collections, it has been retained by a number of area hospitals. One, Saint Joseph's Hospital, is also a chapter 11 debtor in this court, having filed bankruptcy prior to Metropolitan. *In re Saint Joseph's Hospital,* 102 B.R. 416 (Bkrtcy.E.D.Pa.1989). Mr. Bernberg testified that in the Saint Joseph's case, HHL was advised by counsel for the debtor that no application for the retention of his firm was necessary, and so none has been filed.

In response to this testimony the objectors offered in evidence Ex. BC–2 which is a copy of an order in the Saint Joseph case. In that order, dated June 21, 1989, Judge School deleted from the proposed language of the order a provision which stated that court approval of

the debtor's retention of "collection agencies" was not required. The evidence in this dispute showed that HHL was aware of that deletion before Metropolitan filed its bankruptcy petition.

**2.** Ms. Feldman was an attorney in a firm different from Mr. Tabas'; the Feldman firm was retained by the debtor, with court approval, as special counsel to handle collection of certain accounts receivable of the debtor.

**3.** Feldman had to be concerned that HHL's services did not duplicate her firm's services; otherwise compensation for one might be disallowed by this court. *See generally Matter of Bar–B–Que Management Associates, Inc.,* 82 B.R. 152, 154 (Bankr.M.D.Fla.1988).

pare the petition. I request that you forward a draft of said petition to my attention prior to filing." Ex. H-3 at 3.

Based upon these sentences, Bernberg waited to hear from Tabas. In either late September or early October, after having made intermittent and unreturned calls to Tabas, Bernberg did speak with Tabas regarding HHL's application for appointment. N.T. at 98–99. Tabas advised that he did not believe Feldman's letter constituted an agreement for purposes of filing the application, and suggested that Bernberg contact the debtor's general counsel, Griffith and Burr, P.C., to coordinate an acceptable, final agreement. N.T. at 99.

Bernberg did contact counsel (in either late September or early October) and asked him to "reduce the documentation to an agreement." N.T. at 99. Counsel did so, and sent a copy of the proposed agreement to Bernberg by facsimile machine on October 11, 1989. Apparently the next day Bernberg made some corrections to the agreement, so that in his view it would accurately reflect the terms that had been agreed to in negotiation with Feldman, and returned a copy of the amended agreement by facsimile to general counsel. *See* Ex. H-4. In the cover letter to general counsel, Bernberg notes that "Mr. Tabas has indicated that he would be in a position to file a Petition within a matter of days once he has recieved [sic] your authorization to do so. By way of this letter, I am also requesting that Mr. Tabas seek an *expedited hearing date* regarding our Petition, if at all possible." Ex. H-4 (emphasis in original).

Following the review and approval by Feldman and Winter of the revised agreement, general counsel sent a letter to Tabas dated October 17, 1989, which relayed to Tabas their approval. The letter states that "Bankruptcy Court approval should be obtained as quickly as possible." Ex. H-5.

After receiving this letter, Bernberg waited for what he believed to be a reasonable amount of time for Tabas to provide HHL with a copy of the application but nothing was forthcoming. Therefore, Bernberg began calling Mr. Tabas on the telephone, but was unsuccessful in reaching him. N.T. at 101–02. On November 1, 1989 Bernberg called and spoke with a colleague of Tabas, Michael Halprin. Bernberg asked Halprin to ascertain the status of the application for appointment. N.T. at 102. By letter dated November 1, 1989, Bernberg wrote to Tabas, in care of Halprin, asking him to contact Bernberg about the status of the application. *See* Ex. H-6. Later that day Tabas contacted Bernberg by telephone, advising him that Halprin would be preparing the application for appointment, and suggesting that Bernberg call Halprin on November 2 to answer any final questions Halprin would have. N.T. at 103–04. These discussions yielded an "addendum" to the agreement, dated November 3, 1989, which specified that HHL would "continue to pursue collection claims previously placed with the firm by Parkview and Springfield Divisions subject to a 33⅓% contingency fee, said fee to be deducted from collections generated by HHL Financial Services, Inc." *See* Ex. H-7, at 2.

On November 7, Bernberg received a proposed draft of the application for appointment from Halprin, and received a copy in final form on either November 13 or 14, 1989. N.T. at 104. On November 14, 1989, this application for the approval of the debtor's employment of HHL was filed with the bankruptcy court, seeking appointment retroactive to July 11, 1989. Between July 11th and November 13, 1989, HHL collected approximately $1,200,000.00 on behalf of the debtor, from which it now seeks a fee, pursuant to its agreement, of roughly $155,000.00.

HHL has a staff of approximately 105 in its Philadelphia office which provide services to a number of area hospitals; 8 to 10 of these individuals apparently worked exclusively on the debtor hospitals' accounts. In order to perform the billing services for HHL these individuals must have a general understanding of the regulations that pertain to MA eligibility; some individuals are employed because of their extensive background in the social services field and their ability to assist persons pursuing MA eligi-

bility. N.T. at 106–07. No license, degree or certification is required of HHL employees to perform these services, although they do receive "an extensive internal training process." N.T. at 107–108. These employees work with the patient and the patient's family to obtain the necessary documentation that would substantiate the MA application. N.T. at 108. They may also become involved in the administrative process should a patient's MA eligibility be denied by the state. HHL's services resulted in the collection of Medicaid payments for the benefit of the debtor. N.T. at 109. Indeed, as noted above, the amount that HHL claims it is owed for services it performed during the period between July 11 and November 13, 1989, which is apparently based on the amounts collected for the debtor, approximates $155,000.00. N.T. at 104.

Other relevant testimony revealed that HHL had provided these services on behalf of another area hospital also undergoing reorganization through a chapter 11 bankruptcy, St. Joseph's Hospital. Bernberg testified that attorneys involved in that case advised him that an application on behalf of HHL seeking employment as a professional was unnecessary. N.T. at 114. Counsel in this case gave him different advice. *Id.* (*See also* footnote 1, *supra*.) Bernberg testified that he became aware of the potential risk to his firm of providing services to this debtor without court approval at some point in August, and became more concerned as time went by. N.T. at 115. Bernberg, himself an attorney but one not familiar with bankruptcy law, N.T. at 115, did not consider obtaining the advice of independent bankruptcy counsel on behalf of HHL on this question because he was dealing with bankruptcy counsel for the debtor's estate, the

debtor's general counsel and its special collection counsel. Since these attorneys were working on the matter, Bernberg believed the interests of HHL were being adequately served. N.T. at 116.

As stated above, after a hearing held in late December, 1989, the application was approved, in part, by my order dated January 25, 1990, effective the date that HHL's application for employment was filed by the debtor. The issue of employment from July 11, 1989 through November 13, 1989 was deferred and it is that issue which is now before me.

## II.

As the parties recognize, there are two separate issues to be addressed in this dispute. First, I must determine whether HHL is a professional under 11 U.S.C. § 327(a) of the Bankruptcy Code. Second, if HHL is a professional, I must then decide whether its appointment should be on a *nunc pro tunc* basis.

Probably because of the motion before me, in which the debtor expressly requests HHL's appointment under section 327(a) retroactive to July 11, 1989, the date on which the debtor filed its bankruptcy petition, the parties [4] discuss these two issues in reverse order. That is, they address whether retroactive relief is appropriate under *Matter of Arkansas Co., Inc.*, 798 F.2d 645 (3d Cir.1986), and then address whether HHL is a professional. Logically, though, one only considers retroactive appointment for professionals. *See also In re Interstate Restaurant Systems, Inc.*, 61 B.R. 945 (Bankr.S.D.Fla.1986). Therefore, I shall address this problem in the sequence first mentioned—turning initially to the question of whether HHL is a professional.[5]

---

**4.** Although the debtor filed the instant motion, HHL and its counsel have actually litigated the matter.

**5.** The indenture trustee argues that the debtor cannot now assert that HHL is not a professional because of the debtor's motion that it be so appointed, and because HHL was appointed prospectively by order dated January 25, 1990. (This order was entered by agreement, with the

parties deferring the *nunc pro tunc* aspect to this later date.) I disagree.

To the extent that the indenture trustee contends that my order prospectively appointing HHL is "law of the case" on the question of whether HHL is a professional within the meaning of section 327(a), it misunderstands that legal precept. As recently explained by Judge Dubois in *Eckell v. Borbidge,* 114 B.R. 63, 68 n. 5 (E.D.Pa.1990), the doctrine of "law of the case

## A.

This initial issue stems from section 327(a), which states:

(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

The origins of this subsection are former General Orders 44 and 45, which were promulgated by the Supreme Court in 1939 and have long since been superseded by formal bankruptcy rules of procedure. General Order 44 concerned the appointment of attorneys. General Order 45 stated:

Order 45. Auctioneers, Accountants and Appraisers

No auctioneer or accountant shall be employed by a receiver, trustee or debtor in possession except upon an order of the court expressly fixing the amount of the compensation or the rate or measure thereof. The compensation of appraisers shall be provided for in like manner in the order appointing them.

When the Commission on Bankruptcy Laws of the United States, H.R.Doc. No. 93–137, 93d. Cong., 1st Sess. (1973), proposed the overhaul of the former Bankruptcy Act, it sought to modify and codify the provisions of these General Orders as follows:

Section 4–309, Employment of Attorneys, Accountants, Appraisers, Auctioneers, et al.

(a) Authority to Employ. The trustee, with the administrator's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, and other personnel necessary to carry out his duties under the Act. If the trustee is authorized to operate the business of the debtor and the debtor has regularly employed attorneys, accountants, or other persons on salary, the trustee may retain or replace such employees if the employment is necessary in the operation of the business of the debtor.

*Id.*, Pt. II at 88–89.[6]

The Code as enacted altered the language suggested by the Commission. Instead of "other personnel necessary to carry out his duties," the statute refers to "other professional persons ... to represent or assist the trustee in carrying out the trustee's duties...."

█ This evolution convinces me that in determining whether an individual needs court approval for employment under section 327(a), that individual must be *both* a professional as well as someone representing or assisting the trustee in the fulfillment of his or her official duties. Those duties are defined by 11 U.S.C. § 704 for chapter 7 trustees and 11 U.S.C. §§ 1106(a), 1108 for chapter 11 trustees. *See* H.R.Rep. 95–505, 95th Cong., 1st Sess. at 404 (1977). Since a debtor in possession under 11 U.S.C. § 1107(a) has virtually all the rights and responsibilities of a chapter 11 trustee, *accord In re Providence Tele-*

---

only applies to issues that were actually decided by the court or were decided by implication." In this instance, I never decided, even by implication, the issue whether HHL is a professional because all parties in interest agreed to its prospective appointment. Furthermore, if the order itself implies such professional status, Judge Dubois also notes that a court has the discretion to correct any judicial error in light of all the evidence presented. *Id.* That is, the principle of law of the case does not serve as an absolute bar to revisiting an issue.

Here, I conclude it would be inappropriate and manifest *error to bar HHL from* asserting that it is not a professional simply because it refused to litigate the issue concerning prospective ap-

pointment. Not only would such a bar undermine policies favoring settlements, and policies favoring trial on the merits, but the contention overlooks a party's right to present alternative positions. Fed.R.Civ.Pro. 8(a). *See, e.g., U.S. v. Kales,* 314 U.S. 186, 62 S.Ct. 214, 86 L.Ed. 132 (1941); *Paxton v. Desch Bldg. Block Co.,* 146 F.Supp. 32 (E.D.Pa.1956).

**6.** A response to the Commission proposal was submitted by the National Conference of Bankruptcy Judges, and introduced as H.R. 32, 94th Cong. 1st Sess. (1975). Section 4–312 of H.R. 32 contained similar language but omitted the need for approval by an "administrator."

*vision, Ltd. Partnership*, 113 B.R. 446, 450 (Bankr.N.D.Ill.1990), including the authority to operate under section 1108, the issue here becomes whether the professional is assisting the debtor in possession in its duties. Someone not a professional in a broad sense is not within the scope of § 327(a); moreover, a professional that is not engaged to assist the trustee (or debtor in possession) in his or her duties also falls outside the reach of this subsection.

This analysis puts me slightly at odds with one of the earliest formulations of the scope of section 327(a). In *Matter of Seatrain Lines, Inc.*, 13 B.R. 980, 981 (Bankr. S.D.N.Y.1981), the bankruptcy court offered this reasoning:

> For the purposes of section 327(a), "professional person" is limited to persons in those occupations which play a central role in the administration of the debtor proceeding.... Court approval is required for the retention of [a professional person, who is] intimately involved in the administration of the debtor's estate.

I conclude that, at best, this approach addresses only the second prong of § 327(a) but does not address the first—viz., the definition of "professional."

Clearly, a professional is not simply "personnel," hired by the debtor in possession, as that standard was rejected by Congress when it reviewed the work product of the Commission. I note that a "profession" is generally defined as:

> A vocation or occupation requiring special, usually advanced, education and skill....
>
> The labor and skill involved in a profession is predominantly mental or intellectual, rather than physical or manual.
>
> The term originally contemplated only theology, law and medicine, but as applications of science and learning are extended to other departments of affairs, other vocations also receive the name, which implies professed attainments in special knowledge as distinguished from mere skill.

*Black's Law Dictionary* 1089–90 (5th ed. 1979).

■ From the four examples provided by the statute, attorneys, accountants, appraisers, and auctioneers, it seems apparent that the licensing of the skill is not a prerequisite to being classified as a professional under section 327(a). *See In re Northeast Dairy Cooperative Federation, Inc.*, 74 B.R. 149 (Bankr.N.D.N.Y.1987). Appraisers and auctioneers need not be licensed. Indeed, many decisions conclude that an individual may be deemed a professional even though no evidence was presented that such person was licensed to perform his or her function. *Accord, F/S Airlease II, Inc. v. Simon*, 844 F.2d 99 (3d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988) (airplane broker is a professional); *In re Interstate Restaurant Systems, Inc.*, 61 B.R. 945 (Bankr.S.D.Fla.1986) (credit adjustment company appointed as secretary to creditors' committee viewed as a professional); *In re Providence Television*, 113 B.R. 446, at 450 (Bankr.N.D.Ill.1990) (media broker is a professional); *In re Rusty Jones, Inc.*, 109 B.R. 838 (Bankr.N.D.Ill.1989) (financial consultant is a professional); *In re Microwave Products of America, Inc.*, 94 B.R. 971 (Bankr.W.D.Tenn.1989) (public relations firm is a professional); *In re Aladdin Petroleum Co.*, 85 B.R. 738 (Bankr.W.D. Tex.1988) (oil and gas consultant is a professional); *In re Johns–Manville Corp.*, 60 B.R. 612 (Bankr.S.D.N.Y.1986) (lobbyist is a professional). *See also Park Terrace Townhouses v. Wilds*, 852 F.2d 1019 (7th Cir.1988) (property manager viewed as a professional). *Compare Matter of Reda, Inc.*, 54 B.R. 871, 882 n. 25 (Bankr.N.D.Ill. 1985) (fire insurance adjuster is not a professional). Thus, a professional should be considered someone with a special knowledge and skill usually achieved by study and educational attainments whether licensed or not. *Accord In re Interstate Restaurant Systems, Inc.*, 61 B.R. at 949.

It is such an approach which supports the conclusion reached in *In re Windsor Communications Group, Inc.*, 68 B.R. 1007, 1012 (E.D.Pa.1986), where the District Court suggested that in usual circumstances a collection agency would not be considered a professional. That conclusion

could easily follow from a determination that the skill involved in debt collection is not of a level that would declare it a profession. Generally, in the process of debt collection there clearly is an element of skill involved, but it is one that is relatively easily mastered without significant training or education.

Here, however, the services of HHL go far beyond mere debt collection. HHL was engaged by the debtor because a substantial portion of its patients were not self-insured. In certain instances, the Commonwealth of Pennsylvania provides "insurance" for such individuals through its Medicaid Program. If the individual meets financial eligibility requirements, medical eligibility requirements, and makes a timely request for medicaid assistance, funds may be allocated to the medical provider for its treatment of that individual.

It is obviously beneficial to a hospital to be able to seek payment for services from the state, rather than to try to collect from the individual patients who may be without assets. The function of HHL was to interview these patients, review their treatment records, determine which patients might be medicaid eligible, and submit a timely application for eligibility for that individual with the Commonwealth. If eligibility were granted, then HHL would submit, in the proper format, the debtor's request for reimbursement and would be responsible for insuring that the Commonwealth paid whatever was required under the medicaid regulations.

These services require a specialized knowledge of the medicaid statute and regulations, *see* 55 Pa.Code §§ 1101.11 *et. al*, the use of proper forms, strict compliance with the time deadlines involved, the skills of a social worker in interviewing patients, and perhaps even a knowledge of the administrative hearing process for contesting the denial of MA eligibility. These tasks are undertaken by HHL employees only after particularized training in this narrow field; this training is conducted or supervised by attorneys and experienced nonattorneys. As HHL proudly proclaims, there are only a few firms with its expertise in this specialized area.

■ The services provided by HHL do not involve merely attempting to persuade account debtors to pay on outstanding receivables, as is the usual debt collection practice. If this were HHL's task, then perhaps I would not consider HHL as a professional. But here, HHL deals with one account debtor—the Commonwealth of Pennsylvania; the Commonwealth's ability to pay is not problematic for this debtor in bankruptcy. Instead, HHL was hired to develop or create the MA accounts receivable, as well as collect them. Without its efforts, the debtor was neither seeking nor receiving all potential MA reimbursements. HHL has developed a narrow expertise in an area of the law, the Medical Assistance Program, and makes use of attorneys and nonattorneys in that field. Thus, I conclude that, because of the highly specialized and technical nature of HHL's services, it is more like a paralegal professional than a debt collector, and is a professional within the meaning of § 327(a).[7]

### B.

■ This conclusion, though, does not end the analysis. The second question is whether HHL's employment was intended to assist the debtor in possession in the performance of duties that were required of Metropolitan by virtue of its fiduciary status as debtor in possession. In that regard, I view HHL as serving such a role.

The premise of decisions such as *Seatrain* and *Manville* is that certain professionals are "simply" engaged by a debtor

---

7. Recently, in *In re Neidig Corp.*, 117 B.R. 625, 629 (Bankr.D.Colo.1990), the court emphasized the "autonomy or discretion the person is given by the debtor or trustee in performing his services" as a significant factor in deciding whether an individual was a professional within the meaning of section 327(a). While autonomy and discretion may be relevant in determining the professionalism of the services rendered, they would not be determinative. For example, a typical collection agency might have extensive autonomy and discretion in collecting receivables; yet the services provided might not rise to the level of a professional. Nonetheless, even under the *Neidig* analysis, HHL would still be viewed as a professional.

in possession as a part of its normal day to day operations. Those business operations are considered by those courts as distinct from the performance of fiduciary duties— duties described by them as "affecting the administration of the debtor's reorganization." *Manville*, 60 B.R. at 620. In light of the provisions of subsections 327(b) and 327(e), however, I am doubtful that the reference in section 327(a) to professionals assisting the trustee in the exercise of his or her duties can be limited solely to administrative tasks such as formulating a chapter 11 plan.

Section 327(b) states that court approval is not necessary for a trustee (or a debtor in possession) to engage professionals "if necessary to the operation of the [debtor's] business" if such professionals were previously, or now replace, prepetition salaried employees of the debtor. *See generally Park Terrace Townhouses v. Wilds*. If there were a valid distinction in section 327(a) between court approval of professionals involved "in the mechanics of the debtor's business operations", *Manville*, 60 B.R. at 620, and those involved in administration of the debtor's reorganization, the § 327(b) exception to engaging professionals with court approval would be unnecessary.

Similarly, the purpose behind section 327(e) is to permit the retention of special counsel to represent the debtor in significant litigation even though such counsel might not be "disinterested." *See, e.g., In re G & H Steel Service, Inc.*, 76 B.R. 508, 510 (Bankr.E.D.Pa.1987). *See generally* 2 *Collier on Bankruptcy* ¶ 327.03[6] (15th ed. 1990). In other words, § 327(e) involves court approval for the appointment of counsel that will be involved in litigation that may yield a significant judgment for or against the estate. Again, this retention does not concern a professional involved in the administration of the chapter 11 case; yet court approval is required nevertheless.

The *Seatrain* distinction also leaves unexplained the virtually uniform conclu-

sion that brokers are professionals governed by section 327(a). *In re Providence Television*, 113 B.R. at 450 (and cases cited). The function of the broker is to assist in the sale of an asset, which may or may not be significant to the estate. This function cannot always be considered "central" to case administration. However, sales of assets or the recovery of intangible assets, such as choses in action, would fall within a trustee's duties and those of a debtor in possession.

■  Therefore, rather than limit the scope of section 327(a) only to those professionals with "a central role in the administration of the" case, *Seatrain*, 13 B.R. at 981, I would recognize that a chapter 11 debtor in possession, which chooses to continue to operate, has the duty to operate its business in a prudent, competent fashion by virtue of 11 U.S.C. §§ 1107, 1108. *Accord U.S. ex rel. Harrison v. Estate of Deutscher*, 115 B.R. 592 (M.D.Tenn.1990). Those professionals who assist the chapter 11 debtor in this regard are assisting it in the performance of its duties and need court approval. *Id.* Indeed, the *Manville* court intimates as much when it refers to the reach of section 327(a) as including professionals "who play a part in ... disposing of or acquiring assets...." 60 B.R. at 621.[8]

HHL, by its own acknowledgement, was involved in creating and collecting postbankruptcy receivables in a four month period worth more than $1,200,000.00 to the estate and which were significant to the debtor's cash flow if this debtor was to continue to operate and try to reorganize. It would not have been prudent for the debtor to ignore these potential MA receivables in the postbankruptcy operation of its hospitals. Therefore, I conclude that HHL provided the debtor with professional services designed to assist the debtor in fulfilling its chapter 11 functions. As a result, HHL is a professional within the scope of

---

**8.** Stated differently, the ability of a debtor in possession to operate under 11 U.S.C. § 1108, and to use, sell or lease property in the ordinary course of its business without court approval, 11

U.S.C. § 363(c)(1), is applicable to the engagement of professionals only as permitted by section 327(b). *See U.S. ex rel. Harrison v. Estate of Deutscher*.

section 327(a) and prior court approval for its retention was required.

I regard this conclusion as consistent with purpose of section 327(a). The allowance of a priority claim reduces the amount of estate funds available to prepetition creditors. Thus, what constitutes an administrative expense is, in general, narrowly construed. *See Matter of Jartran,* 732 F.2d 584 (7th Cir.1984); *In re Massetti,* 95 B.R. 360 (Bankr.E.D.Pa.1989). Professionals are entitled to be paid on a first priority basis pursuant to 11 U.S.C. §§ 503(b)(2), 507. *Accord F/S Airlease II, Inc. v. Simon,* 844 F.2d 99, 108 (3d Cir.1988). The unfettered opportunity for the debtor in possession or trustee to engage professionals could create unnecessary administrative expenses. *See U.S. ex rel. Harrison v. Estate of Deutscher,* 115 B.R. at 600; *In re Providence Television,* 113 B.R. at 451. Congress expected that court supervision would minimize the potential for the unneeded creation of priority professional claims, *see Matter of Arkansas Co., Inc.,* 798 F.2d 645, 649 (3d Cir.1986); *In re Yeisley,* 64 B.R. 360, 362 (Bankr.S.D.Tex.1986), and so enacted section 327(a). As HHL provided services, as a professional, within the scope of section 327(a), it had a duty to seek court prior approval. The question now becomes whether it is entitled to relief from that duty.[9]

### III.

In *Matter of Arkansas Co., Inc.,* the Court of Appeals established the relevant standard in this circuit for an award of *nunc pro tunc* relief to professionals who do not obtain prior court approval for their employment, as is required by section 327(a):

> To summarize, we hold that retroactive approval of appointment of a professional may be granted by the bankruptcy court in its discretion but that it should grant such approval only under extraordinary circumstances. Such circum-

stances do not include the mere neglect of the professional who was in a position to file a timely application. When considering an application, the bankruptcy court may grant retroactive approval only if it finds, after a hearing, that it would have granted prior approval, which entails a determination that the applicant satisfied the statutory requirements of 11 U.S.C. §§ 327(a) and 1103(a) that the applicant be disinterested and not have an adverse interest, and that the services performed were necessary under the circumstances. Thereafter, in exercising its discretion, the bankruptcy court must consider whether the particular circumstances in the case adequately excuse the failure to have sought prior approval. This will require consideration of factors such as whether the applicant or some other person bore responsibility for applying for approval; whether the applicant was under time pressure to begin service without approval; the amount of delay after the applicant learned that initial approval had not been granted; the extent to which the compensation to the applicant will prejudice innocent third parties; and other relevant factors.

That standard was further discussed in *F/S Airlease II, Inc. v. Simon,* 844 F.2d 99 (3d Cir.1988):

> In *Arkansas,* we held that "bankruptcy courts may, *in extraordinary circumstances,* grant retroactive approval of professional employment." *Id.* at 646 (emphasis added). We adopted a two-part test to determine the propriety of such retroactive approval: first, the bankruptcy court must find, after a hearing, that the applicant satisfies the disinterestedness requirements of section 327(a) and would therefore have been appointed initially; and, second, the court must, in the exercise of its discretion, determine that the particular circumstances presented are so extraordinary as to warrant retroactive approval.

---

**9.** Had HHL provided the same postpetition services which the debtor's salaried employees rendered prior to its bankruptcy filing, it may have fallen within the protection of section 327(b) even though it is receiving compensation on a

percentage basis. *See Park Terrace Townhouses v. Wilds,* 852 F.2d at 1022. However, there was no evidence presented demonstrating that Metropolitan had salaried employees who performed these MA services prior to bankruptcy.

As to the first part of the test, HHL meets the standard. Had it applied for court approval before providing services to the estate, it would have met the requirements of disinterestedness and necessity found in section 327(a). Indeed, HHL was approved by me for prospective employment without opposition from any party in interest by order effective November 14, 1989. However, as to the second portion of the test, HHL's position is problematic.

HHL likens its situation to the accountants in *Matter of Freehold Music Center, Inc.*, 49 B.R. 293 (Bankr.D.N.J.1985), in which retroactive approval was granted. The Third Circuit approved of the *Freehold* decision both in its *F/S Airlease* and *Arkansas* decision. In so doing, the Court of Appeals viewed the accountants as "completely ignorant of the requirements of the Bankruptcy Code and without legal representation, [who] justifiably relied on the superior expertise of another." *F/S Airlease*, 844 F.2d at 107. The *Freehold* decision itself expressly noted that the accountants only became aware of their need for court approval months after they started providing services to the debtor.

> [They], in good faith, *believed* that authorization for their work had been obtained or had been properly arranged.
>
> On August 28, 1984, the accountants learned for the first time that they had not been retained pursuant to Court order and that such Court order was necessary before payment could be made. On that date, the accountants ceased work.

49 B.R. at 294 (emphasis in original).

■ Unfortunately for HHL, the parallel to the *Freehold* accountants is not complete. HHL is not unsophisticated; it has a large staff, is operated by attorneys, it engages attorneys to represent its interests and has been involved in prior bankruptcy matters. Moreover, members of its attorney management were formerly connected to law firms that were involved in bankruptcy cases and presumably knew of the requirements of section 327(a). It cannot suggest that its status as a professional in this case and need for prior appointment comes as a surprise: debtor's various counsel expressly so advised HHL at the outset of this bankruptcy, and the order issued in the Saint Joseph's case so suggests.[10] It is quite true that HHL expected the debtor's counsel to file the necessary application, and indeed continually requested that the debtor do so. But as the Third Circuit has instructed, the fact that a professional relies upon another, typically the debtor's counsel, to file the application needed under section 327(a) is not sufficient in all instances to justify retroactive relief. At some point, once the professional knows of its obligation to seek court approval for its engagement, and knows that it has not been done, the responsibility falls upon it to have the application filed. *F/S Airlease* 844 F.2d at 107. If the debtor's attorney does not act expeditiously, the professional can prepare the necessary documents for the debtor's review and filing.[11] Otherwise, it should cease providing services. *See Freehold*, 49 B.R. at 249.

In this matter, four months passed before HHL's engagement request was filed with this court. Certainly, there was a period of days for which HHL provided services and did not even know of the debtor's bankruptcy filing. I can even accept that the debtor's cash requirements, the time deadlines for obtaining MA eligibility, and debtor's counsel's statements that it would shortly seek court approval on behalf of HHL justify HHL continuing to provide services on behalf of the debtor for

---

10. Even if HHL believed that it was not a professional, such a belief does not by itself constitute an exceptional circumstance justifying retroactive appointment. *Accord In re Northeast Dairy Cooperative Federation, Inc.*, 74 B.R. at 155.

11. In *F/S Airlease,* the Court of Appeals leaves unanswered the question whether the professional itself may file the required application in light of Bankr.Rule 2014. Obviously, there are problems with professionals filing their own

applications rather than the debtor in possession or the trustee. However, in this dispute HHL has retained its own counsel and has actively participated in support of the debtor's motion. No other party has suggested that HHL has no standing to be heard. And if it has standing to be heard, it arguably has standing to file its own application in certain limited circumstances. However, given my resolution of this dispute, I also need not decide this question.

a brief period after it learned of the bankruptcy filing. *See In re Bible Deliverance Evangelistic Church,* 39 B.R. 768 (Bankr. E.D.Pa.1984). But by early August 1989, HHL was informed by debtor's bankruptcy counsel that he would not proceed further absent a new agreement between HHL and the debtor. And by mid–August, or roughly thirty days after the bankruptcy filing (and about three weeks after HHL was aware of the filing), HHL knew or should have known that the employment application had not been filed, that the application would not be filed immediately as it was still negotiating terms with the debtor's various counsel, and that it had a very real problem proceeding further without court approval. At that point it could no longer reasonably rely on the debtor's prompt action in this matter. And, at that point, it should have either ceased to perform any further services until court approval was obtained, or "insure that [such approval] has in fact been sought." *F/S Airlease,* 844 F.2d at 107.

Based upon the record before me, I conclude that the extraordinary circumstances for retroactive approval existed only for the first thirty days of this case. Beyond that time, *nunc pro tunc* approval is improper.

An appropriate order shall be entered.

### ORDER

AND NOW, this 16th day of October, 1990, for the reasons stated in the accompanying memorandum, it is hereby ORDERED that the *debtor's application to employ HHL Financial Services nunc pro tunc is granted in* part. The debtor is hereby authorized to employ HHL between the dates of July 11, 1989 and August 11, 1989. To receive payment, HHL must file the requisite application with this court upon notice as required by Bankr.R. 2002(a).

This order does not modify the order dated January 25, 1990 which permitted the debtor to prospectively employ HHL.