In re ALLEGHENY INTERNATIONAL, INC., Sunbeam Corporation, Sunbeam Holdings, Inc., Almet/Lawnlite, Inc., and Chemetron Corporation, et al., Debtors.

REMCOR, INC., Plaintiff,

v.

ALLEGHENY INTERNATIONAL, INC., Defendant.

Bankruptcy No. 88–00448 JLC.

Adversary No. 90–366.

United States Bankruptcy Court, W.D. Pennsylvania.

Sept. 4, 1992.

See also, 158 B.R. 332, 158 B.R. 356, 158 B.R. 361.

Dennis J. Lewis, Wayne C. Holcombe, George Cass, Buchanan Ingersoll, P.C., Pittsburgh, PA, for debtors.

Douglas A. Campbell, Campbell & Levine, Pittsburgh, PA, for Sunbeam Creditors Committee.

Frederick N. Egler, Jr., Egler, Garrett & Egler, Pittsburgh, PA, for Remcor.

Michael G. Lederman, Sunbeam/Oster Co., Providence, RI, Cynthia A. Baker, Fried, Frank, Harris, Schriver & Jacobson, New York City, for Sunbeam/Oster.

## MEMORANDUM OPINION

JOSEPH L. COSETTI, Chief Judge.

This action arises out of a dispute between the Debtor, Allegheny International,

Inc. (hereinafter "AI") and an environmental waste remediation company, Remcor, Inc. (hereinafter "Remcor"). Remcor and AI entered into contracts post-petition to remediate two sites in Newburgh Heights, Ohio contaminated with low-level radioactive waste (depleted uranium). Remcor filed a complaint against AI and one of its wholly-owned subsidiaries, Chemetron Investment, Inc., to recover funds from AI for work performed. AI asserts that the contracts between AI and Remcor should be reformed and rescinded, and that Remcor should be forced to disgorge funds that AI has already paid to Remcor. For the reasons stated below, the contract will be reformed and AI is ordered to pay reasonable compensation based on a 35% profit to Remcor for work performed after June, 1990.

## I. BACKGROUND

In 1965, Chemetron bought a company called McGean Rohco (hereinafter "McGean"). During the 1970's, McGean operated a chemical plant located on Harvard Avenue in Newburgh Heights, Ohio. Chemetron also owned a dump site located nearby on Bert Avenue, Newburgh Heights, Ohio.

On or about the period of 1965–1971, McGean used depleted uranium in a chemical process for the manufacture of catalysts used by the oil industry. Depleted uranium is a low level radioactive substance that emits a low level of alpha radiation. In the course of the manufacturing process, some of the depleted uranium spilled on the ground at the Harvard Avenue site, contaminating the surface. In addition, when the building that housed the catalyst chemical process was demolished, it appears that portions of the building were disposed of at the Bert Avenue dump site.

The depleted uranium operation had to be performed under a license from the Atomic Energy Commission, the predecessor to the Nuclear Regulatory Commission (hereinafter "NRC"). In the early 1970's when Chemetron ceased using the depleted uranium, it had to obtain permission from the NRC to terminate the license. Before this permission was granted, the NRC was required to inspect the site to be sure the premises were decontaminated.

In 1974 Chemetron sold the assets of McGean. By law, however, Chemetron continued to remain responsible for the radioactive material it produced in the catalyst manufacturing operation before the sale. In 1978 AI bought Chemetron, and Chemetron became a wholly-owned subsidiary of AI.

From 1978–80 AI hired National Lead industries to try and remediate the sites. In 1983, when this attempt to clean up the sites failed, McGean sued Chemetron. The litigation was settled in 1984 by a consent decree signed by District Judge (now Circuit Judge) Mansmann that required Chemetron to clean up the Harvard and Bert Avenue sites. After the consent decree was entered into, AI hired Radiation Management Corporation to remediate the sites. This effort also failed. In addition, during this time, the NRC surveyed the sites and found that the sites continued to be contaminated.

## II. FACTS

In February, 1988, AI, along with its subsidiary Chemetron, filed for protection under Chapter 11 of the Bankruptcy Code. In June, 1988, the NRC threatened Chemetron with substantial fines unless the Harvard Avenue site was cleaned up. In July, 1988, AI hired the plaintiff, Remcor, a Pennsylvania company specializing in waste remediation, to survey and develop a work plan for the Harvard Avenue site.[1] Remcor submitted its work plan to the NRC. The NRC approved the plan in the fall of 1988.[2]

---

**1.** Evidence was introduced at trial that Remcor proposed a more extensive survey of the Harvard Avenue site. However, Steven Wilner, AI's representative in charge of cleaning up the sites, did not want Remcor to do a more extensive survey of the Harvard Avenue site. Record of February 6, 1992 hearing at 123.

**2.** NRC approval meant that the work to be performed at the site and the procedures to be followed were permissible.

Using Remcor's work plan, AI solicited competitive bids for remediation of the sites. On March 8, 1989, Remcor submitted a "Letter Proposal and Contract, Best and Final Offer" ("Letter Proposal") (Defendant's Exhibit 2) to AI for the Harvard Avenue site. The Letter Proposal stated that Remcor would "remove radioactive material from the [Harvard Avenue] site to meet the standards required to obtain complete site release from Nuclear Regulatory Commission (NRC) licensing and regulation." Letter Proposal at 1. Further, the Letter Proposal asserted that Remcor has "intimate knowledge of the site," and that "Remcor will work with AI on this site to contain final costs by precise and selective contaminated material excavation." Letter Proposal at 1. The Letter Proposal also stated that there was an estimated 3,200 cubic feet of identified areas of elevated uranium concentration, and that excavation would be performed by using a "small mechanical excavator and hand tools."[3] Letter Proposal at 3.

Based on Remcor's Letter Proposal, AI awarded the remediation contract to Remcor. Because AI and Chemetron were in Chapter 11, the expenditure of funds for remediation would be both an administrative expense and an expense not in the ordinary course of business subject to court permission pursuant to 11 U.S.C. §§ 503(b) and 363(b).[4] On March 9, 1989, AI sought emergency authorization to expend funds to remediate the Newburgh Heights, Ohio sites.[5] On the same day, this court authorized Chemetron and AI to expend funds to decontaminate the Harvard and Bert Avenue sites. The actual Order of Court did not specify how much would be spent on decontamination. Chemetron's emergency motion to expend funds, however, stated that "[t]he cost of completing the decontamination of the Harvard site in accordance with the License and Consent Decree is estimated at between $400,000 and $500,000."[6]

A final contract between AI and Remcor was executed on March 10, 1989. It specified a lump sum price of $351,500 to remove the estimated 3,200 cubic feet. The contract further provided for the unit price of $109.75 per cubic foot for the removal of any additional materials that had to be excavated in excess of 3,200 cubic feet.[7] The contract estimated the duration of the project to be 40 working days.[8]

In April, 1989 Remcor began its excavation of any contaminated material that had

3. Earl Rothfuss was Remcor's senior project manager for the Harvard and Bert Avenue sites. He conducted the initial survey of the Harvard Avenue site. At trial, evidence was introduced that Rothfuss originally estimated 6,500 cubic feet of contamination at Harvard, but that AI's Steven Wilner wanted to use the lowest reasonable number: 3,200 cubic feet. Further, Mr. Rothfuss testified that Mr. Wilner had received estimates from previous contractors who estimated the amount of contamination at Harvard Avenue from 1,500 to 17,000. Record of February 6, 1992 hearing at 127.

4. 11 U.S.C. § 503(b) provides in pertinent part: After notice and a hearing, there shall be allowed administrative expenses ... including—
   (1)(A) the actual, necessary costs and expenses of preserving the estate....

5. When the Chapter 11 bankruptcies commenced, accounts payable from all of AI's subsidiaries were channeled up to AI for AI to pay. Therefore, AI ultimately paid Chemetron's bills, including the remediation costs.

6. The Order of Court dated March 9, 1989 stated, "[I]t is hereby ordered that Chemetron Investment, Inc. is authorized to expend its funds in decontaminating the sites referred to in the Nuclear Regulatory Commission Materials License...." The Nuclear Regulatory Commission Materials License referred to decontamination of both the Harvard and Bert Avenue sites. Thus, while the emergency motion specified that the $400,000 to $500,000 figure was only for the Harvard Avenue site, the Order of Court contemplated decontamination of both the Harvard and Bert Avenue sites.

7. The contract contemplated the possibility of excavating more than 3,200 cubic feet of materials. It stated "[T]his proposal is submitted on a lump sum cost basis for the specified excavation quantity with a unit price to be applied *in the event additional excavation is required.*" (Emphasis added) Letter Proposal at 1.

8. The contract did say, however, that the "[t]otal project duration, excavation and loading time, transportation and disposal time, and time to return site to original condition will be adjusted as necessary to complete actual excavation quantities." Letter Proposal at 7.

a specific activity in excess of 35 pico-Curies per gram (pCi/g). The methods of excavation applied by Remcor required it to package the contaminated material in containers and ship it to a radioactive waste disposal site. The cost of reburial of the contaminated material is expensive. A slow, conservative removal and sorting technique was adopted to minimize total costs.

The original estimate of 3,200 cubic feet of contaminated waste materials was excavated by the end of April, 1989, in less than 30 days. By early June, 1989, Remcor had excavated approximately a total of 7,750 cubic feet of contaminated material. At this time, Remcor informed AI that the quantity of contaminated material would continue to increase, and that "[t]he ability to estimate this final number had become an impossibility." Defendant's Exhibit # 15, Letter from Remcor to AI, p. 1.

By June 29, 1989, Remcor had excavated 8,600 cubic feet, and estimated that the volume at the Harvard Avenue site might increase to 15,000 cubic feet. Remcor set forth a schedule for job completion to occur by the end of July, 1989, with a total bill of $1,646,250. This was presented to AI as an outside maximum estimate. Defendant's Exhibit # 18, Letter from Remcor to AI, p. 6.

By August 4, 1989 Remcor had excavated 14,300 cubic feet. Remcor further advised AI that 18,000 to 20,000 square feet would be needed to complete the project at Harvard Avenue. Defendant's Exhibit # 22, Handwritten Telephone Record between Remcor and AI, p. 1. In October, 1989 Remcor changed its method of excavating at Harvard Avenue. Instead of ex-

cavating materials in excess of 35 pCi/g, Remcor began to excavate only those materials with a specific activity in excess of 100 pCi/g. By October 2 1989, 22,000 cubic feet had been excavated, and Remcor advised AI that about 30,000 cubic feet would have to be excavated by project completion. Defendant's Exhibit # 30, Letter from Remcor to AI, p. 1.

Each time that Remcor told AI of the change in estimates, AI gave Remcor permission to excavate the additional material. Record of February 6, 1992 hearing, pp. 17–19. AI often cited the bankruptcy political issues and NRC regulatory pressures as the reason for keeping the project going until it was finished. *Id.* at 136. The debtor did not seek further court approval for authority to expend more funds for remediation, even though the project now grossly exceeded the original estimate. In addition to letters, Remcor sent invoices to AI. During excavation, Remcor invoiced AI every two weeks. These invoices informed AI that it was being charged for the excavation of additional amounts of material beyond the original contract estimate of 3,200 cubic feet.[9] Until late spring 1990, AI continued to pay each one of Remcor's invoices in full.

In November, 1989 Remcor and AI entered into three additional contracts for Harvard Avenue and one contract for surveying at Bert Avenue. Again, bankruptcy court approval was not sought. One such contract modified the original March 10, 1989 Harvard Avenue contract by changing the termination requirements.[10] This modification also stated that AI had the right to direct Remcor to stop work if Remcor exceeded its budgetary estimate.[11]

---

9. Between late April, 1989 and June, 1990, Remcor submitted more than twenty (20) invoices to AI.

10. The original March 10, 1989 Harvard Avenue contract required there be a breach before termination of the contract could occur. The November 20, 1989 Harvard Avenue contract modification removed the breach requirement for termination and allowed termination to occur within 20 days written notice. AI counterclaimed that Remcor could not recover lost profits, because AI could terminate the contract

at any time by providing 20 days notice. This court granted interlocutory summary judgment for AI on that issue.

11. The November 20, 1989 Harvard Avenue contract stated, "If it is apparent that the budgetary estimate is not sufficient to complete the project in a satisfactory manner, the client will be advised as soon as practical and unless the client directs us to stop working, all costs will be invoiced to the client." Defendant's Exhibit # 34, Services Agreements, p. 1.

In early 1990, Remcor performed the survey of the Bert Avenue site and submitted a written report to AI and estimated the amount of contaminated material to be 12,-263 cubic feet.[12] By a contract amendment dated March 15, 1990, AI and Remcor entered into an agreement to remediate the Bert Avenue site. A unit price was negotiated at $106.50 per cubic foot; no price was to be charged for a bulk amount. Defendant's Exhibit # 47, Contract Supplement, p. 3. Again, no bankruptcy court approval was sought for this change.

In late spring 1990, Remcor recommenced excavation at the Harvard Avenue site and began excavation at the Bert Avenue site. On June 13, 1990, after three weeks of work at the Bert Avenue site, Remcor notified AI that it had already excavated 12,000 cubic feet of contaminated material, and that it would exceed its original estimate by a large amount.[13] Defendant's Exhibit # 53, Letter from Remcor to AI, p. 1. Similarly, at the Harvard Avenue site, Remcor reported that it had excavated more than 50,000 additional cubic feet of contaminated material. Defendant's Exhibit # 54, Letter from Remcor to AI, p. 1.

As the result of excavating the additional material, Remcor temporarily suspended operations at the Bert Avenue and Harvard Avenue sites to consult with AI. Remcor and AI met on June 18, 1990 to discuss the situation. At the meeting, Remcor informed AI that there was more contamination than previously estimated, and that it was not possible to estimate how much material remained. Record of February 6, 1992 hearing, at 22. In response, AI told Remcor to resume work because they were worried about possible penalties from the NRC if the remediation was not completed, and that it was necessary to complete the project before AI could successfully reorganize. At the meeting, AI also discussed Remcor's profit margin. AI wanted to renegotiate the contract at a more reasonable rate. Remcor refused to renegotiate. Consequently, AI agreed to pay only 75% of outstanding invoices, and Remcor agreed to this. Record of February 6, 1992 hearing at 22.

Remcor resumed work on or about June 25, 1990, and continued until July 13, 1990. AI did not pay Remcor for the work performed during this time. On July 13, 1990, AI verbally instructed Remcor to stop work. Record of February 6, 1992 hearing at 23. On July 17, 1990, Remcor sent AI a "Request for Direction" letter asking AI how to proceed at the sites. In this letter, Remcor asserted that AI owed it $7,350,600 for work already performed, including $6,162,000 for work done since late June, 1990.[14] Plaintiff's Exhibit # 22, Letter from Remcor to AI, p. 1 On July 20, 1990, AI sent Remcor a letter terminating the contract between AI and Remcor. Plaintiff's Exhibit # 24, Letter from AI to Remcor, p. 1.

The procedure followed by Remcor to remove contaminated material from the ground at the Harvard Avenue site is known as guided excavation. This procedure involves scooping material out of the ground with a bucket and screening it twice for contamination.[15] This meticulous approach for excavation took Remcor 14 days to excavate the first 3,200 cubic feet

---

**12.** Evidence introduced at the February 6, 1992 hearing indicated that Remcor offered to perform a more extensive survey of the Bert Avenue site but that AI declined. Record of February 6, 1992 hearing, p. 138.

**13.** In this letter, Remcor notified AI that "The total volume of material to be excavated and disposed from this site will be significantly larger than previous estimates."

**14.** After Remcor recounted the amount of material that had been excavated at the Harvard Avenue and Bert Avenue sites, the total amount was found to be much smaller and the $7,350,-000 figure was subsequently amended to $3,786,449.

**15.** Remcor excavated only a small amount of material at one time. The process of testing the site of the cut in the dirt with an instrument to detect radiation, digging up the scoop of dirt with a back hoe, testing the back hoe bucket for a reading on contamination, and then putting the dirt in the appropriate pile took about 15 minutes. Rescreening of the excavated dirt for contamination was also done.

of material.[16]

In late spring 1990, when work resumed at the Harvard Avenue site, and commenced at the Bert Avenue site, the guided excavation method was no longer used. A system of mass excavation that dug far greater quantities of material was put into place. In one day Remcor could excavate many times more than the amount it took 14 days to excavate using guided excavation. For example, in eleven days at the Bert Avenue site, 40,000 cubic feet was excavated, and in twelve days at the Harvard Avenue site, 50,000 cubic feet was removed.[17] Thus, in June and July 1990, the daily averages at the sites were more than the original 3,200 amount.[18] Remcor's ability to excavate huge amounts of soil translated into huge profits for Remcor.[19] Thus far, AI has paid Remcor $7,570,000 for work performed, and Remcor's complaint now asserts that AI owes an additional $3,700,000.

After AI terminated the contracts and refused to pay Remcor, Remcor filed suit against AI for breach of contract in the Court of Common Pleas of Allegheny County, Pennsylvania. AI removed the action to this court. Remcor's amended complaint against AI contains nine counts:

I. *Breach of contract*—Remcor argues that it is owed $3,786,449 for work performed.

II. *Lost profits*—Remcor maintains that it is owed in excess of $5,000,000 for lost profits.

III. *Breach of contract*—Remcor maintains that AI's termination of the contracts forced Remcor to incur additional expenses.

IV–IX. Remcor claims that it is owed $90,866.18 for work it performed for AI at six other sites in the United States.[20]

In its amended answers, AI brings four counterclaims against Remcor:

I. *Breach of Contract*—AI alleges that Remcor's work performed at the Harvard Avenue and Bert Avenue sites was poor and unsatisfactory and thus it breached implied and express warranties. AI also maintains that Remcor excavated materials whose radioactivity was too low to require excavation, in addition to materials that were not contaminated. AI requests reimbursement of its disposal costs, as well as court costs and attorneys' fees.

II. *Misrepresentation*—AI argues that Remcor misrepresented the price and the amount of work needed at the Harvard site. AI also asserts that Remcor falsified invoices.

III. *Rescission and Reformation*—AI argues that the contract for the Harvard Avenue site was entered into on the assumption of the 3,200 cubic feet number to be removed with small tools; this was the basis of the bargain. Further, the prices

---

**16.** Furthermore, according to testimony at trial of Mr. Roman Iwanyshyn, Remcor devoted 810 hours to excavating the first 5,200 cubic feet of material. The next 24,000 feet of excavation, however, took only 1,080 hours. Testimony of Mr. Iwanyshyn, Record of February 7, 1992 hearing, p. 294.

**17.** On July 2, 1990, 15,391 cubic feet of material at the Harvard Avenue site was excavated, and 11,167 was excavated at the Bert Avenue site. This is over one hundred times what was excavated per day at Harvard Avenue at the start of the project when the guided excavation method was used. Because Remcor was terminated by AI before Remcor disposed of the contaminated material, over 100,000 cubic feet of material excavated between June, 1990 and termination was left piled at the sites. Record of February 6, 1992 hearing, p. 237.

**18.** According to the testimony of Mr. Roman Iwanyshyn, in 1990 at the Harvard Avenue site it took Remcor only 678 hours to excavate 53,-610 feet of contaminated material. It took a similar amount of hours to excavate 52,745 at the Bert Avenue site. Record of February 7, 1992 Hearing, p. 295.

**19.** At trial, AI introduced evidence asserting that Remcor's profit margin at the Bert Avenue site was 91%, and 77% at the Harvard Avenue site. Record of February 7, 1992 hearing, p. 60.

**20.** These six sites are:
1. Bra–Con Industries, Inc., Livonia, Michigan
2. Brandywine, Reedsville, Pennsylvania
3. Chemetron, Port Hope, Ontario, Canada
4. Eliskim, Inc., Anderson, South Carolina
5. Temrac Site, Bally, Pennsylvania
6. Woodshaft, Inc., Amory, Mississippi

of $109.75 per cubic foot price at the Harvard Avenue site and $106.50 at the Bert Avenue were entered into on the assumption that only a small volume of contaminated material was going to be excavated. When the results differed, AI maintains that there was a mutual mistake of fact. In the alternative, AI asserts that Remcor was unjustly enriched by a huge profit. In light of the mutual mistake of fact and alleged misrepresentations made by Remcor, AI demands that this court reform and rescind the Harvard Avenue and Bert Avenue contracts in accordance with reasonable economic realities.

IV. *Transfer Avoidance and Disgorgement*—Between March, 1989 and July, 1990 AI paid Remcor approximately $7,500,000. AI maintains that this court did not authorize these payments. AI demands that Remcor return the $7,500,000 that AI paid to Remcor.

## III. DISCUSSION

In response to Remcor's claims, AI asserts both contract and bankruptcy arguments to support contract reformation and rescission.

(A) There was a mutual mistake of fact allowing rescission and reformation of the contracts under contract law.

(B) Under 11 U.S.C. § 363(b)(1), these payments to Remcor were not in the ordinary course of business. Bankruptcy court approval was needed to expend such funds not in the ordinary course. Furthermore, pursuant to 11 U.S.C. § 328, Remcor was a professional and therefore Remcor's compensation had to be reasonable.

### A. Non–Bankruptcy Grounds: Mutual Mistake of Fact

 In Count III of its counterclaim, AI argues that the contracts between AI and Remcor should be reformed and rescinded because of a mutual mistake of fact. AI believes that the basic assumption of the Harvard Avenue contract was that 3,200 cubic feet would be excavated, and that the

per cubic foot figure was based on a small volume of contaminated material. Thus, in June and July, 1990 when Remcor excavated over 100,000 cubic feet of soil at the Bert Avenue and Harvard Avenue sites, a mutual mistake of fact occurred. Further, Remcor was able to obtain huge profits via the mass excavation process. For these reasons, AI maintains that the Harvard Avenue contract should be reformed and rescinded consistent with commercially reasonable profits.

■ A mutual mistake of fact occurs "where both parties share a common assumption upon which they based their bargain and that assumption is false, the transaction may be avoided if, because of the mistake, a quite different exchange of values occurs from the exchange of values the parties contemplated, unless the risk is otherwise allocated by agreement, custom, or law." J.D. Calamari and J.M. Perillo, Contracts § 9–26 (3d ed. 1987); *See also,* Restatement (Second) of Contracts § 152 (1962). Under Ohio law,[21] mutual mistake in formation of a contract requires that contract provision in question be contrary to the understanding of all contracting parties. *Snedegar v. Midwestern Indem. Co.,* 44 Ohio App.3d 64, 541 N.E.2d 90 (Franklin Co.1988). A mutual mistake as to an essential element of the transaction requires relief by cancellation or rescission. *Irwin v. Wilson,* 45 Ohio St. 426, 15 N.E. 209 (1887).

The original contract between Remcor and AI for the Harvard Avenue site specified a lump sum price of $351,500 to remove the estimated 3,200 cubic feet. The contract further provided for a unit price of $109.75 per cubic foot of any additional materials that had to be excavated in excess of the 3,200 cubic feet estimate. The contract for the Bert Avenue site had an estimate of 12,263 cubic feet, at a unit price of $106.50 per cubic foot.

In mid-June, 1990, Remcor discovered much more contaminated material at the two sites than was originally expected.

---

**21.** The contract between Remcor and AI states that the agreement is governed by the laws of the state in which work is to be performed. The

Harvard Avenue and Bert Avenue sites are located in Ohio. Defendant's Exhibit # 2, Services Agreement, paragraph 13, p. 4.

Remcor informed AI of the discovery and met with AI to discuss. On previous occasions when Remcor informed AI that there were additional contaminated materials, AI paid Remcor's invoice and instructed Remcor to resume work. At a point in time, AI realized it was paying Remcor too much and attempted to renegotiate the contracts.

In the past, Remcor was able to give AI an estimate of how much more material would have to excavated to complete the job. However, in June, 1990, Remcor was not able to make such an estimate. In fact, as it developed between June 25, 1990 and July 13, 1990, Remcor via its mass excavation process was able to extract unprecedented amounts of contaminated material.[22]

A mutual mistake of fact occurred. The contracts between Remcor and AI contemplated a large per cubic foot price for a relatively small amount of contaminated material. When small quantities were anticipated, the cost of removal was to be minimized by using small tools to minimize the quantities. This would have been a costly method if large quantities were anticipated. Neither party contemplated the excavation of large amounts of material.

When Remcor recommended the large amounts of material in June, 1990, and AI objected to excavation at the original price, the contracts no longer reflected the original understanding of the parties. *Snedegar v. Midwestern Indem. Co.*, 44 Ohio App.3d 64, 541 N.E.2d 90 (Franklin Co. 1988). As a result, that portion of the contracts for materials excavated after mid-June, 1990 may be rescinded. *Irwin v. Wilson*, 45 Ohio St. 426, 15 N.E. 209 (1887). For the periods of time before June, 1990, AI consented by paying for the excavation. Therefore, this portion of the contracts will

not be rescinded. This court believes that the contract was contrary to the understanding of the parties. However, under these circumstances, it was necessary for AI to raise the issue. AI raised it later in June, 1990.

### B. *Bankruptcy Grounds: Ordinary Course of Business and Reasonable Compensation*

In Count IV of its counterclaim, AI asserts that this court should order Remcor to return the $7,570,000 paid to Remcor, because Remcor did not obtain the approval of this court to spend the funds. Remcor, however, asks for summary judgment on this issue arguing that, as a matter of law, AI is not entitled to disgorgement of the payments. For the reasons discussed below, Remcor was hired as a professional organization for the purposes of 11 U.S.C. § 327(a). AI's payments to Remcor were not made in the ordinary course of its business. Remcor's motion for summary judgment is denied. However, Remcor will be required to return only the amounts charged to AI that were not reasonable pursuant to 11 U.S.C. § 328(a) for work performed after mid-June, 1990.

### 1. *Professional*

■ Title 11 U.S.C. § 327(a) provides that the trustee, with the court's approval, may employ "professional persons" to assist the trustee in carrying out the trustee's duties.[23] In addition, 11 U.S.C. § 328(a) requires that the terms of employment of the professional be "reasonable," and allows the bankruptcy court to modify the terms and condition of employment if they prove to be improvident at the conclusion of the employment.[24] Remcor argues

**22.** On July 2, 1990, about 15,391 cubic feet of material at the Harvard Avenue site was excavated, and 11,167 cubic feet was excavated at the Bert Avenue site. This is over a hundred times what was excavated per day at Harvard Avenue at the start of the project when the guided excavation method was used. A total of over 100,000 cubic feet of material was excavated during this period. Record of February 6, 1992 hearing, p. 156.

**23.** Title 11 U.S.C. § 327(a) states in pertinent part:

[T]he trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons ... to represent or assist the trustee in carrying out the trustee's duties under this title.

**24.** Title 11 U.S.C. § 328(a) states in pertinent part:

that it should not be held this "reasonable" standard because Remcor is not a "professional."

"Professional persons" is not defined in the Bankruptcy Code. Courts have said that "[W]hether services rendered are sufficiently 'professional' in nature does not turn solely on the type of educational degree that one possesses." *In re Interstate Restaurant Systems, Inc.*, 61 B.R. 945, 949 (BCSDFla1986). The test is whether "a specialized service was performed which benefitted the estate." *Id.*

Courts have also looked at the effect of the professional on the bankruptcy case, and how important their role is to the reorganization process. *In re Aladdin Petroleum Co.*, 85 B.R. 738, 740 (BCWDTex1988). "If the person seeking to be appointed as a trustee's agent actually impacts upon the administration of the debtor's estate, that person may be a professional person regardless of the label given to its function." *Id.* at 740–741.

Chemetron did not conduct any business during the bankruptcy proceedings. Remcor's services were the only activity taking place at Chemetron. Chemetron depended upon Remcor to remediate the Harvard Avenue and Bert Avenue sites in order for Chemetron to comply with a consent decree. Thus, Remcor's activities had a substantial impact on Chemetron's ability to successfully reorganize.

Another important factor in determining "professional" status is whether an entity holds itself and its employees "out to the public as being specially trained and uniquely qualified (by both education and experience) to supply the type of superior quality consulting services provided by professionals." *In re Carolina Sales Corp.*, 45 B.R. 750, 752 (BCEDNC1985). In its

March 8, 1989 Letter Proposal, Remcor held itself out as having "intimate knowledge" of the Harvard Avenue site and that it would provide AI with the "most cost-effective remediation." In the work plan that Remcor prepared for submission to the NRC in July, 1988, Remcor portrayed itself as being unique among hazardous waste firms. Among other claims, Remcor stated that it had "engineering and scientific expertise," and "in-house knowledge of regulations, technical requirements, and liability issues...."

Remcor held itself out as a professional in its invoices. Every invoice that Remcor submitted for excavation work at Bert Avenue and Harvard Avenue described the work invoiced as "FOR PROFESSIONAL SERVICES RENDERED." Also, the original contract of March 8, 1989 incorporated a "Services Agreement" which stated at the heading of its first paragraph, "FEES FOR PROFESSIONAL SERVICES."

Remcor is a "professional" pursuant to 11 U.S.C. § 328(a). Therefore, this court holds that Remcor's employment is subject to a "reasonable" standard. Moreover, 11 U.S.C. § 328(a) allows the bankruptcy court to modify the terms and conditions of AI's and Remcor's contract if it proves to be improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

**2. *Ordinary Course of Business***

Remcor argues that the payments to it can not be modified because they were made in the "ordinary course of business." Title 11 U.S.C. § 363(b)(1) requires a notice and hearing before the trustee may use, sell, or lease property of the estate other than in the "ordinary course of business".[25] Remcor maintains that under 11 U.S.C. § 363(c)(1), a notice and hearing are not

---

The trustee ... may employ ... a professional person ... on any reasonable terms and conditions of employment.... Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of develop-

ments not capable of being anticipated at the time of the fixing of such terms and conditions.

**25.** 11 U.S.C. § 363(b)(1) provides:

The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

required when payments are made in the "ordinary course of business." [26]

In *In re Berkley Multi–Units, Inc.*, 88 B.R. 394, (BCMDFla1988), the court stated that "The purpose of the 'ordinary course of business' exception ... is to allow a business to continue its daily operations without incurring the burden of obtaining court approval or notifying creditors for minor transactions, while at the same time protecting secured creditors and others from the dissipation of the estate's assets." *Id.* at 397. In addition, "transactions that either by their size, nature or both are not within the day to day operations of a business are considered extraordinary." *In re Jeurissen*, 85 B.R. 531, 537 (BCDCMinn1988).

The size of the payments AI made to Remcor indicates that they were not ordinary course transactions. Remcor was paid $7.57 million to perform services on behalf of Chemetron, an insolvent company with a total amount of assets worth approximately $14.57 million. While creditors of Chemetron may have had an expectation that a reasonable amount of funds would be spent to remediate the Harvard Avenue and Bert Avenue sites, this level of expenditure could not have been anticipated. Chemetron creditors were harmed by a decision of the parent debtor-in-possession to distribute a large share of Chemetron's assets without providing the court and/or the creditors an opportunity to examine the price and other terms of the contract. *In re Selgar Realty Corp.*, 85 B.R. 235, 240 (BCEDNY1988).[27]

In addition, Chemetron was not in the business of nuclear waste remediation.[28] Payments to Remcor for nuclear waste remediation services could not be in the "ordinary course of business." *See, e.g., In re Berkley Multi–Units, Inc.*, 88 B.R. 394, 396–397 (BCMDFla1988). A federal district court consent decree required Chemetron to remediate the sites for the benefit of McGean Corporation. Remediating the sites allowed McGean to use the sites; it benefitted the Chemetron estate by reducing a liability.

If the payments to Remcor were not in the "ordinary course of business", 11 U.S.C. § 549(a) would permit the trustee or a debtor-in-possession[29] to avoid a post-petition transfer when court approval has not been granted.[30] Remcor argues, however, that the payments to it were authorized by this court. Remcor believes that this court's order of March 9, 1989 authorized Chemetron to pay Remcor a total of $11.36 million for its services.

While the Order of Court did not specify a dollar amount, the Emergency Motion estimated the costs of remediation to be between $400,000 to $500,000 at the Harvard Avenue site.[31] Admittedly this figure was an estimate, but it stretches credulity and the policy of 11 U.S.C. § 363(b)(1) to hold that this Order of Court authorized expenditures for the Harvard Avenue and Bert Avenue sites in an amount more than fifteen (15) times the original estimate. Creditors have a right to expect that the debtor will obtain court authority to expend

---

**26.** 11 U.S.C. § 363(c)(1) states in pertinent part:

If the business of the debtor is authorized to be operated under section 721, 1108, 1304, 1203, or 1204 of the title and unless the court order otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

**27.** At the hearing on AI's Emergency Motion to Expend Funds, the Committee of Unsecured Creditors expressed concern about the lack of information in the motion.

**28.** Similarly, AI was not in the nuclear waste remediation business.

**29.** Under the Bankruptcy Code, the debtor-in-possession has all of the rights and powers of a trustee. *See, e.g., In re McGovern Auto Speciality, Inc.*, 51 B.R. 511, 513 (BCEDPa1985).

**30.** 11 U.S.C. § 549(a) states in pertinent part:
  (a) the trustee may avoid a transfer of property of the estate—
    (1) made after the commencement of the case; and
    (B) that is not authorized under this title or by the court.

**31.** *See supra* note 6 and the accompanying text.

a majority of a corporation's assets for a single activity not in the ordinary course. In addition, Remcor was aware of the need for bankruptcy court approval, but did not seek such approval or request AI to seek such approval.[32]

■ Under 11 U.S.C. § 549(a), the trustee or debtor-in-possession has the power to avoid transfers made without court approval or not authorized by the Bankruptcy Code. Title 11 U.S.C. § 550(a) allows the trustee or debtor-in-possession to recover, for the benefit of estate, transfers avoided under 11 U.S.C. § 549.[33] The Bankruptcy Code provides this court with authority to order the debtor-in-possession to avoid the amount paid to Remcor that was made without court approval.

■ This result, however, would not be equitable to Remcor. While Remcor may have underestimated the amount of contaminated materials present, there is no evidence to indicate that Remcor intentionally misled AI, or that Remcor was grossly negligent. More important, AI is not without fault; AI continued to pay Remcor's invoices for the excavation of additional materials beyond the original estimate. This court believes that Remcor should be required to reimburse AI for that portion of Remcor's compensation that is not "reasonable" because a mutual mistake of fact was clearly apparent in June, 1990.

In the preceding discussion, it was determined that Remcor is a "professional." Pursuant to 11 U.S.C. § 328(a), this court can modify the terms and conditions of AI's and Remcor's contracts if they prove to be improvident in light of developments not capable of being anticipated at the time

of contracting. At the time the contracts between Remcor and AI were entered into, excavation of the amounts that were removed at the Harvard Avenue and Bert Avenue sites from mid-June to mid-July, 1990 were not anticipated. In light of the quantity of materials actually found and the tools and expenses originally anticipated, the contracts were improvident. Therefore, this court will permit the debtor to rescind and modify the Harvard Avenue and Bert Avenue contracts and order Remcor to return to AI that part of Remcor's compensation that was not "reasonable" commencing mid-June 1990.

■ Remcor's profit margin at the Harvard Avenue site was 77%, and 91.9% at the Bert Avenue site. (These figures exclude disposal costs which were pass-through costs.) Record of February 7, 1992 hearing at 280. Expert testimony by Mr. Roman Iwanyshyn at trial established that these profit margins were not "reasonable," and that a "reasonable" profit for a company such as Remcor would range from 20% to 35%. Though determining a fair profit is difficult for this court to calculate in a free market economy, 35% is an attractive profit.

Under both common-law grounds of mutual mistake of fact, and independently under the bankruptcy law basis of "non-ordinary course of business" and "reasonable" compensation, this court will grant the request to modify the terms of Remcor's contracts with AI.[34] Remcor asserts that AI owes Remcor $3,786,449. Based on a reasonable 35% profit margin, AI is ordered to pay Remcor for that portion of the

---

**32.** Remcor's Earl H. Rothfuss testified in his deposition that Remcor's Vice President and Chief Operating Officer Leo Brausch knew about the need for bankruptcy court approval for Harvard Avenue. Mr. Rothfuss further testified in his deposition that he had discussed with an NRC official the need for bankruptcy court approval for the Bert Avenue contract.

**33.** Title 11 U.S.C. § 550(a) states in pertinent part:

Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 549 ... the trustee may recover,

for the benefit of the estate the property transferred, or, if the court so orders, the value of such property....

**34.** Bankruptcy law, 11 U.S.C. § 328 and 11 U.S.C. § 363, alone would provide this court with the authority to order Remcor to be compensated after June, 1990 at a reasonable rate. The defense of mutual mistake of fact, however, provides additional non-bankruptcy grounds for rescission of the contracts, reinforcing the important relationship between bankruptcy law and non-bankruptcy law.

$3,786,449 that is due for work performed by Remcor after June 25, 1990.[35]

This holding recognizes the interdependence of non-bankruptcy law and bankruptcy law. Bankruptcy law aspires to change rights only as much as is necessary in order to vindicate bankruptcy policy. In *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), the Supreme Court held that "property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Id.* at 55, 99 S.Ct. at 918.

In the instant case, bankruptcy law does not provide a different result than the non-bankruptcy law result. Under non-bankruptcy law, because of the mutual mistake of fact, AI would be able to rescind its contract with Remcor. Similarly, under the bankruptcy law provisions of 11 U.S.C. §§ 363 and 328, the bankruptcy court can modify the provisions of the contracts and order compensation for Remcor at a reasonable rate. Thus, consistent with *Butner*, bankruptcy law does not provide a different non-bankruptcy result.

### C. Remcor Counts III and IV–IX, and AI Counts I and II

#### 1. Remcor Counts III and IV–IX

In Count III of its complaint, Remcor asserts that because of AI's breach of contract it was forced to incur expenses in demobilization and withdrawal from the site. The contract amendment of November 20, 1989 between AI and Remcor allows either party to terminate the contract with 20 days' notice. The contract does not require either party to pay damages incurred as a result of termination.[36] Therefore, this count is denied.

In Counts IV–IX, Remcor claims that it is owed $90,866.18 for work it performed for AI at six other sites in the United States. These counts sound in set-off. The debtor has not challenged this claim. It should be added to the amounts and to Remcor.

#### 2. AI Counts I and II

In Count I of its counterclaim, AI maintains that Remcor performed so poorly at the Harvard Avenue and Bert Avenue sites that it breached implied and express warranties. AI wishes to recover its own disposal costs, and well as court costs and attorneys' fees.

Evidence does not support this argument. In its contract with AI, Remcor warranted that it would perform "in accordance with generally and currently accepted engineering principles and practices." Letter Proposal, at 2. Remcor may have excavated some material that was not contaminated, but there is no evidence that it breached any warranties. Count I of AI's counterclaim is denied.

Under Count II of its counterclaim, AI maintains that Remcor misrepresented the price and the amount of work to be done at the Harvard site: the 3,200 cubic feet and the $351,500 price. AI also asserts that Remcor falsified invoices. While Remcor did underestimate the amount of material to be excavated and the cost, there is no evidence that Remcor committed an intentional misrepresentation or falsification. Count II of AI's counterclaim is denied.

An appropriate Order is attached.

### ORDER OF COURT

AND NOW, this 4 day of September, 1992, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that AI is to pay Remcor reasonable compensation, as

---

**35.** The funds already paid by AI to Remcor will not be subject to the reasonableness requirement, because the amounts were paid before AI objected to Remcor's profit margin and the contract changed from the contemplation of the parties.

**36.** The original March 10, 1989 contract stated that the breaching party would be responsible for damages. But, upon granting summary judgment for AI on Count II of Remcor's complaint, this court ruled that the termination provision of the November 20, 1989 contract superseded the March 8, 1990 contract's termination requirement.

described in the Memorandum Opinion, for work performed after June 25, 1990. A status conference is set for October 13, 1992, 10:30 A.M., 1603–05 Federal Building, Pittsburgh, Pennsylvania 15222, to determine this amount.

This Order remains interlocutory until a distinct amount is determined.

At Pittsburgh, Pennsylvania.